**Reversed and Remanded and Opinion filed June 11, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00657-CV

**NUSTAR ENERGY, L.P., AND KANEB MANAGEMENT COMPANY, L.L.C., Appellants**

**V.**

**DIAMOND OFFSHORE COMPANY, Appellee**

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2011-55475**

## O P I N I O N

This is an appeal of the trial court's rulings on cross-motions for summary judgment by the successors of the parties to an asset and stock purchase agreement. The parties to this suit asked the trial court to render declaratory judgment interpreting the contract. The seller's successor contends that the trial court erred in granting summary judgment in favor of the purchaser's successor and in

denying its own summary-judgment motion. Because we conclude that the agreement is ambiguous, we reverse the judgment and remand the case to the trial court.

## I. FACTUAL AND PROCEDURAL HISTORY

This appeal arises from a contract dispute between Diamond Offshore Company ("Diamond" or "Buyer") and Kaneb Management Company, L.L.C. ("Kaneb" or "Seller") concerning an asset and stock purchase agreement ("the Agreement") between their respective predecessors; to avoid confusion, we will refer to Diamond and Kaneb as though they were the original parties to the contract.[1] Kaneb provided contract drilling services to the oil-and-gas industry. Directly or through subsidiaries, it owned a number of offshore drilling rigs, barge rigs, some yard facilities, personal property, and equity in other companies.

On June 30, 1989 (defined in the Agreement as "the Closing Date"), Diamond bought Kaneb's assets. Some of Kaneb's workers continued to work for Diamond after the sale; in the Agreement, these individuals are called "Hired Employees." Individuals who had been employed by Kaneb before the sale but did not work for Diamond after the sale are identified in the Agreement by the defined term, "Employees." Some Employees later sued Diamond for personal injuries they allegedly sustained as a result of their exposure to asbestos while employed by Kaneb.

Diamond sued Kaneb and its parent company NuStar Energy L.P., seeking

---

[1] The assets and stock at issue were owned by Diamond M Company or by its direct or indirect subsidiaries, Diamond M Drilling Company, Diamond M Exploration Company, Diamond M General Company, and Diamond M International Company. Diamond M Company's successor, appellant Kaneb, is a wholly owned subsidiary of appellant NuStar Energy L.P. In 1989, LTR Texas Corp. bought the assets and stock at issue, together with the right to use the "Diamond M" name. Diamond Offshore Company is the successor to LTR Texas Corp.

declaratory judgment that under the terms of the Agreement, Diamond did not assume liability for claims by "Employees" that were "[b]ased upon injuries identifiably sustained prior to the Closing Date" and that resulted from Kaneb's "ownership or operation of the assets prior to the Closing Date." Diamond also asked for a declaration that Kaneb assumed liability for these claims. Kaneb counterclaimed, asking for a declaration that Diamond assumed liability for claims that allegedly arose from asbestos exposure before the Closing Date, but that accrued after the Closing Date.

The parties filed cross-motions for traditional summary judgment. As summary-judgment evidence, both sides relied on a copy of the Agreement. Diamond's summary-judgment evidence additionally included a claims-administration agreement that was attached to and incorporated in the Agreement; securities filings from 2010 of the limited partnership of which Kaneb is a subsidiary; a non-party's discovery responses made in a Louisiana case; and the affidavits of two attorneys who participated in negotiating and drafting the Agreement. In response to Kaneb's summary-judgment motion,[2] Diamond additionally relied on excerpts from the deposition of an attorney; insurance policies that expired more than a decade before the Agreement; and a recent email exchange between attorneys seeking evidence of insurance coverage. Kaneb objected to the attorneys' affidavits on numerous grounds, and in the alternative, moved for a continuance.

The trial court denied Kaneb's motion for continuance, but held that "the contract is not ambiguous on the issue presented" and struck the attorneys'

---

[2] In Kaneb's motion for summary judgment, NuStar Energy, L.P. also was identified as a counter-plaintiff and a movant. Because the record shows that Kaneb is a successor to one of the sellers under the Agreement, but does not show NuStar's connection, we refer to the motion as though it were filed solely by Kaneb. Diamond did not object in the trial court that NuStar had asserted no counter-claims against it.

affidavits as "inadmissible extrinsic evidence on the issue of intent and contract interpretation." The trial court granted summary judgment in Diamond's favor, and in its amended order on the motions, the trial court made the following declarations:

(1) Plaintiff [Diamond]—the liability successor of Buyer—did not assume liability for claims:

    a. Filed by the Sellers' Employees who did not become Hired Employees after the Closing;

    b. Based upon injuries identifiably sustained prior to the Closing; or

    c. Resulting from the Sellers' ownership or operation of the Assets prior to the Closing.

and

(2) Defendant Kaneb Management Co., LLC—the liability successor of Sellers—assumed liability for claims:

    a. Filed by the Sellers' Employees who did not become Hired Employees after the Closing;

    b. Based upon injuries identifiably sustained prior to the Closing; or

    c. Resulting from the Sellers' ownership or operation of the Assets prior to the Closing. [3]

The trial court denied all requests for attorneys' fees.

## II. ISSUES PRESENTED

In its first issue, Kaneb argues that its interpretation of the Agreement is the

---

[3] The trial court further stated, "This Order makes no finding as to liability, if any, of Nustar Energy LP as a liability successor to Sellers." Nustar and Kaneb filed a notice of appeal of this order. We abated the appeal because in its pleadings, Diamond also requested judgment against Nustar, and the trial court's order did not address any claims against that defendant, and thus, the order was not a final judgment. Diamond's claims against Nustar were severed, and we reinstated the appeal. *See* TEX. R. APP. P. 27.2. ("The appellate court may treat actions taken before an appealable order is signed as relating to an appeal of that order and give them effect as if they had been taken after the order was signed.").

4

only reasonable one, and thus, the trial court erred in denying its summary-judgment motion and granting Diamond's cross-motion. As an alternative, Kaneb argues in its second issue that its interpretation of the Agreement is at least a reasonable one, and thus, the trial court erred in granting summary judgment to Diamond. As a further alternative, Kaneb asserts in its third issue that we must reverse the ruling and remand the case because the particular declarations recited in the judgment do not resolve the parties' dispute.

### III. STANDARD OF REVIEW

We review de novo the trial court's grant of a summary judgment. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007)). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

When we review the rulings on cross-motions for summary judgment, we consider the evidence presented by each party, determine de novo all questions presented, and render the judgment the trial court should have rendered. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (sub. op.); *Tex. Mun. Power Agency*, 253 S.W.3d at 192.

## IV. GOVERNING LAW

When interpreting a contract, our primary concern is to ascertain and give effect to the written expression of the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). By this approach, we "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 126. The parties' intent is governed by what is written in the contract, not by what one side contends they intended but failed to say. *See id.* at 127. Thus, "it is objective, not subjective, intent that controls." *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (citing *City of Pinehust v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). We therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). We do not consider only those parts of a contract that favor one party, *City of Keller*, 168 S.W.3d at 811, but examine the writing as a whole to harmonize and give effect to all of the contract's provisions. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We also bear in mind the particular business activity to be served, and when possible and proper to do so, we avoid a construction that is unreasonable, inequitable, and oppressive. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987).

If a contract is not ambiguous, courts must enforce it as written without considering parol evidence for the purpose of creating an ambiguity or giving the contract "a meaning different from that which its language imports." *David J.*

6

*Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex 2008) (per curiam). We determine whether a contract is ambiguous by looking to the contract as a whole in light of the circumstances present when the parties executed it. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). The contract is unambiguous if it can be given a certain or definite meaning as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012); *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). A contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent. *El Paso Field Servs.*, 389 S.W.3d at 806; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

A contract is not necessarily ambiguous simply because some sections arguably conflict. This is because the parties may choose to set out a general rule in one provision and exceptions to that rule in other provisions. Thus, "[t]o the extent of any conflict, specific provisions control over more general ones." *Grynberg v. Grey Wolf Drilling Co., L.P.*, 296 S.W.3d 132, 137 (Tex. App.— Houston [14th Dist.] 2009, no pet.) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994)).

## V. ANALYSIS

In arguing that its interpretation of the Agreement is the only reasonable one, Kaneb and Diamond rely on different provisions. In its summary-judgment motion, Diamond asserted that liability for the Employee claims at issue is governed by Section 10.13 of the Agreement, which provides as follows:

7

10.13 <u>Employee Injury Claims</u>.  Sellers will bear the entire cost and expense of all Claims arising out of injuries identifiably sustained by Employees on or before the Closing Date.  Buyer will bear the entire cost and expense of all Claims arising out of injuries identifiably sustained by Hired Employees or other employees of Buyer after the Closing Date.

In its summary-judgment motion, Kaneb asserted that under Section 2.1 of the Agreement, liability for the asbestos-related claims at issue was assigned to Diamond:

2.1  <u>Liabilities Assumed by Buyer</u>. . . . Buyer agrees . . . to assume, at the Closing, and thereafter to pay, perform and discharge . . . the following liabilities and obligations of Sellers (but only such liabilities and obligations):

(a) All liabilities and obligations relating to the ownership or operation of the Assets which accrue or arise after the Closing, including such liabilities and obligations based upon a condition or condition that existed with respect to the Rigs . . . prior to Closing . . . .

As can be seen by comparing the two provisions, Section 10.13 addresses the specific allocation of liability for claims of injured workers, and Section 2.1 concerns allocations of liability generally.  Diamond relies on a specific provision, while Kaneb relies on a general provision.

Because specific provisions control over conflicting general provisions, *see Grynberg*, 296 S.W.3d at 137, either party could prevail by establishing that (a) liability for the claims at issue is unambiguously allocated to the other party in Section 10.13; or (b) Section 10.13 does not apply at all, and liability for the claims at issue was unambiguously allocated to the other party in Section 2.1.  Diamond took the former position, and Kaneb took the latter.

Kaneb contends that Section 10.13 does not apply because it has expired, and if this is correct, then it is unnecessary for us to expend much time on its

interpretation. We therefore consider this argument first. We conclude, however, that Section 10.13 has not expired, but it is ambiguous.

## A. Section 10.13 Has Not Expired . . .

Kaneb argues that Section 10.13 should have no bearing on the analysis of the contract because it was in effect only during the "gap" period between the Agreement's execution on June 16, 1989 and the Closing Date on June 30, 1989. According to Kaneb, Section 10.13 contains covenants that did not survive the Closing because they deal with a short, narrowly defined period of time, and after the Closing, the need for such interim measures passed and the covenants had no further force or effect. But the second sentence of Section 10.13 specifically allocates liability for claims "identifiably sustained by [Diamond's employees] *after* the Closing Date." (emphasis added). If Section 10.13 did not survive the Closing, then this language never could have been given effect. Under the rules of contract construction, we cannot infer an expiration date that would render half of the provision meaningless. *See El Paso Field Servs.*, 389 S.W.3d at 805 ("In discerning the parties' intent, 'we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" (quoting *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 333)).

Kaneb further contends that Section 10.13 applied only to claims "that the parties could identify at or near the time of closing as having been sustained before closing, and whose financial impact could be addressed under [Section 3.3 which] required adjustments to the cash portion of the purchase price in the 90 days after closing." Nothing in the Agreement indicates that this is so. Section 3.3 provides that within 90 days after the Closing Date, the parties could adjust the cash portion

9

of the purchase price upward or downward to the extent that the "Current Liabilities" assumed by Diamond on the Closing Date and identified in the "Closing Balance Sheet" varied from a stated amount. If the liability did not exist on the Closing Date, or if the liability existed but the parties were unaware of it, then the cash portion of the purchase price was not adjusted. In Section 10.13, however, the parties allocated liability for "the entire cost and expense of *all* [c]laims arising out of injuries identifiably sustained" at a certain time,[4] and not merely those claims that were identified as "Current Liabilities" or those that resulted in an adjustment to the cash portion of the purchase price.

We conclude that Section 10.13 has not expired. Because it is the most specific unexpired provision addressing the allocation of liability for employee injuries, the case turns on the meaning of this section.

**B. . . . But Section 10.13 Is Ambiguous . . .**

The trial court's judgment addressed the allocation of liability for asbestos-related claims by "Employees"—that is, persons who were employed by Kaneb but never employed by Diamond—but did not address the allocation of liability for asbestos-related claims by "Hired Employees"—that is, persons who were employed by Diamond. Only the first sentence of Section 10.13 allocates liability for claims arising from injuries to "Employees." It provides that Kaneb is liable for the "cost and expense of all Claims arising out of injuries identifiably sustained by Employees on or before the Closing Date." The question is, when are asbestos-related injuries "identifiably sustained"? The Agreement itself provides no answer.[5]

---

[4] Emphasis added.

[5] Neither party argues that the reference in Section 10.13 to "injuries identifiably sustained" employs a specialized term with a commonly understood meaning in the industry. *Cf.*

The parties might reasonably have intended the phrase to refer to the date on which injuries are manifested. The reference to the "cost and expense of all Claims arising out of injuries" suggests that the parties may have intended the word "injuries" to mean injuries capable of supporting a claim for damages. As Kaneb has pointed out, asbestos exposure does not inevitably lead to disease. *See Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770–71 (Tex. 2007); *Temple–Inland Forest Prods. Corp. v. Carter*, 993 S.W.2d 88, 95 (Tex. 1999). Thus, the parties did not necessarily intend their use of the word "injuries" to encompass asbestos exposure before any compensable damage occurred. The parties reasonably may have intended to treat latent occupational illnesses as injuries that are "identifiably sustained" on the date on which it can be identified that such an injury has been sustained.

On the other hand, because this section deals exclusively with claims arising from injuries to the parties' employees, the parties may have intended the construction of this provision to be informed by Texas workers'-compensation law. When the Agreement was executed, "injury" was defined in the Workers' Compensation Act as "damage or harm to the physical structure of the body and such diseases or infections as naturally result therefrom."[6] The Texas Supreme Court explained that "[d]amage embraces direct physical injury to a cell, tissue, organ or organ system; 'harm' to the physical structure of the body embraces also impairment of use or control of physical structures, directly caused by the accident." *Bailey v. Am. Gen. Ins. Co.*, 154 Tex. 430, 436–37, 279 S.W.2d 315,

---

*XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627–28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (explaining that, in determining whether a contract is ambiguous, courts consider the "the commonly understood meaning in the industry of a specialized term, which may be proven by extrinsic evidence such as expert testimony or reference material").

[6] Act of May 28, 1971, 62nd Leg., R.S., ch. 834, § 1, 1971 TEX. GEN. LAWS 2539, 2539–40 (current version at TEX. LAB. CODE ANN. § 401.011(26) (West 2006)).

319 (1955).[7] The Workers' Compensation Act further provided that "[w]here compensation is payable for an occupational disease, the employer in whose employ the employee was last injuriously exposed to the hazards of such disease shall be deemed the employer within the meaning of the Act."[8] Considering Section 10.13 in light of Texas workers'-compensation law, the parties reasonably may have intended that the date on which "injuries [were] identifiably sustained" meant the date identified as the time when the employee was last injuriously exposed to asbestos fibers and presumably sustained damage—even if the damage at that time was only on a cellular level—that gave rise to the occupational disease and the claim.

### 1. . . . and the ambiguity is not resolved by other contract provisions . . .

Kaneb and Diamond have attempted to buttress their respective interpretations of Section 10.13 by arguing that a particular reading is consistent with other provisions in the Agreement that address the allocation of liabilities or benefits in connection with other matters, or that address claims of which the parties had notice at an earlier date. Some of the provisions they cite are more consistent with Kaneb's overarching interpretation of the Agreement, and some are more consistent with Diamond's interpretation. The problem, however, is that Section 10.13 is the only unexpired provision specifically dealing with the allocation of liability for claims arising from employee injuries, and because specific provisions control over conflicting general provisions, *see Forbau*, 876 S.W.2d at 133–34, there is no way to know whether the parties intended that section to be consistent with or an exception to any other allocation of liability.

---

[7] The language construed by the court in *Bailey* differs from the language of the 1971 version of the Act in effect at the time of the Agreement only in that the 1971 Act used the plural *infections* rather than the singular *infection*.

[8] Act of Apr. 14, 1947, 50th Leg., R.S., ch. 113, § 6, 1947 TEX. GEN. LAWS 176, 178 (current version at TEX. LAB. CODE ANN. § 406.031(b) (West 2006)).

For example, the parties allocated responsibility in Section 2.1 for "liabilities and obligations" that "accrue or arise after the Closing." Kaneb has argued, and we agree, that "accrue" can reasonably be construed to mean the date on which a cause of action accrues.[9] Because the symptoms of an asbestos-related disease typically appear years after the exposure, if at all, the Texas Supreme Court has held that the cause of action for latent occupational disease does not accrue until "a plaintiff's symptoms manifest themselves to a degree or for a duration that would put a reasonable person on notice that he or she suffers from some injury and he or she knows, or in the exercise of reasonable diligence should have known, that the injury is likely work-related." *Childs v. Haussecker*, 974 S.W.2d 31, 33 (Tex. 1998). Thus, a cause of action for an injury arising from asbestos exposure before the Closing Date might not "accrue" until many years after the Closing Date.

But the word "accrue" does not appear in Section 10.13. There is no reason to assume that the parties intended different language in the two sections to have the same meaning. *See DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 185 (Tex. App.—Fort Worth 2012, no pet.) ("It is not reasonable to interpret both terms . . . to have the same meaning as that would render one or the other term meaningless or redundant."); *see also XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 630 n.5 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (concluding that a party's construction of two terms to mean substantially the same thing was not reasonable where, among other things, the party failed to account for the use of different terms in different parts of the contract). Because none of the provisions

---

[9] This is not the only reasonable construction of the term as used in Section 2.1. Given that the parties also refer in Section 2.1 to the "Closing Balance Sheet," their reference to "liabilities" that "accrue" after the Closing Date may have been intended to refer to a debt that, for accounting purposes, is chargeable at a particular time. *See* BLACK'S LAW DICTIONARY 21 (6th ed. 1990) (defining "accrued liability" as "[a]n obligation or debt which is properly chargeable in a given accounting period but which is not yet paid or payable.").

cited by either party use the expression "injuries identifiably sustained" (or even "identifiably sustained"), they do not provide guidance on the parties' intentions in using that language.[10]

## 2. . . . or by caselaw interpreting liability-insurance policies . . .

The parties also have looked outside the Agreement to case law that each contends supports its reading or undermines the contrary interpretation. Diamond contends that Kaneb's construction is unreasonable in that it conflicts with cases in which courts considered whether a claim for latent occupational disease was covered under occurrence-based insurance policies. In particular, Diamond relies on a line of cases that follows the holding of *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1220 (6th Cir. 1980), *decision clarified on reh'g*, 657 F.2d 814 (6th Cir. 1981). There, the court addressed the question of whether coverage under an occurrence-based insurance policy that potentially covered a latent occupational disease caused by asbestos exposure should be considered triggered by the claimant's exposure to the harmful substance or by manifestation of the illness or injury. Each of the insurance policies at issue provided coverage for "damages because of . . . bodily injury . . . caused by an occurrence." *Id.* at 1216. "Bodily injury" was defined to include "sickness or disease sustained by any person which *occurs* during the policy period, including

---

[10] We have not found another asset-purchase agreement containing this exact provision; however, a provision nearly identical to Section 10.13 was included in a 1986 purchase agreement and was construed by New York's Workers' Compensation Board in a trio of claims. *See Employer: MRC Bearings*, No. 8902 1506, 2004 WL 3060139 (N.Y. Work. Comp. Bd. Dec. 31, 2004); *Employer: MRC SKF, Inc*, No. 8921 2379, 2004 WL 3060140 (N.Y. Work. Comp. Bd. Dec. 31, 2004); *Employer: MRC Bearings*, No. 8932 0814, 2004 WL 3060141 (N.Y. Work. Comp. Bd. Dec. 31, 2004). There, the parties agreed that "[Seller] will bear the entire expense and cost of all workers' compensation claims arising out of injuries identifiably sustained by employees of the Business on or before the Closing Date." *Employer: MRC Bearings*, 2004 WL 3060139, at *1. The reviewing board concluded that the provision was "ambiguous when considered in the context of an occupational disease claim." *Id.*, 2004 WL 3060139, at *4.

14

death at any time resulting therefore." *Id.* (emphasis added). "Occurrence" was defined to include "injurious exposure to conditions which results, during the policy period, in bodily injury . . . ." *Id.* The court noted that the date on which an injury "occurs" has been interpreted differently in statute-of-limitations cases, worker's-compensation cases, and health-insurance cases, and evaluated each type of case to determine whether the same rationale applied to liability-insurance policies. The court reasoned that the "exposure theory" applied because terms such as "'bodily injury' and 'occurrence' are inherently ambiguous as applied to the progressive disease context," *id.* at 1222, and the state law governing the dispute provided that "'[i]f there are ambiguities in the policy, or uncertainty over its interpretation, the policy is to be construed against the insurer, and in favor of the insured.'" *Id.* at 1219–20 (quoting *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 451 F. Supp. 1230, 1237–38 (E.D. Mich. 1978), *aff'd*, 633 F.2d 1212. The court therefore concluded that the exposure theory applied because it would leave the manufacturer insured, whereas adopting the manifestation theory would effectively leave the manufacturer uninsured. *Id.* at 1222.

But the Agreement is not an insurance contract, and an ambiguous provision in this context presents a question of fact as to the parties' intent, which is a matter to be resolved by the factfinder. *See Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam). The parties also chose not to use the words "occur" or "occurrence" in Section 10.13, and there is no reason to assume that they intended the reference to the date on which an injury was "identifiably sustained" to be interpreted to mean the date on which an injury "occurred." Moreover, the parties specified that the Agreement is governed by Texas law, and even in the context of liability-insurance policies, the Texas Supreme Court had not adopted either the manifestation or the exposure rule at the time the Agreement was executed. *See*

15

*Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 853 n.20 (Tex. 1994) (declining to identify the test that applies when determining which of several insurance policies are triggered by a single continuing occurrence). *See also Clemtex, Inc. v. Se. Fid. Ins. Co.*, 807 F.2d 1271, 1278 (5th Cir. 1987) ("The continuing judicial debate about the appropriate trigger of insurance coverage refutes defendants' contention that the exposure theory was the established rule at the time . . . ."). Neither party has cited any authority that addresses the meaning of "injuries identifiably sustained" (or even "identifiably sustained"), and the authorities on which they rely do not shed light on the parties' intent in choosing this language in 1989.

### 3. *. . . or by statute . . .*

Diamond also relies in its summary-judgment motion on Section 10.254 of the Texas Business Organizations Code, which provides in effect that a person who acquires property through an asset-purchase agreement "may not be held responsible or liable for a liability or obligation of the transferring *domestic entity* that is not expressly assumed by the person." TEX. BUS. ORGS. CODE ANN. § 10.254 (West 2012) (emphasis added). Although Diamond contends that this statute also supports its position that it has not assumed liability for the asbestos-related claims at issue, that statute does not apply. It post-dates the Agreement by many years, and none of Kaneb's predecessors were "domestic entities." Moreover, Diamond's argument based on this statute begs the question of whether Diamond "expressly assumed" liability for the asbestos-related claims at issue.

Diamond also argues that the Jones Act supports its interpretation of the Agreement. Under the Jones Act, "[a] seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman

16

may elect to bring a civil action at law, with the right of trial by jury, against the *employer*." 46 U.S.C.A. § 30104 (2012) (emphasis added). Diamond contends that Kaneb's interpretation of the Agreement conflicts with federal law because "Diamond is not a proper party to a suit filed by [Kaneb's] Employees for employment-related exposure to asbestos during [Kaneb's] ownership of the rigs." There is no reason to assume, however, that the parties intended to allocate liability in such a way that Diamond would not be a proper party to a suit by an injured employee pursuant to the Jones Act.

### 4. . . . or by extrinsic evidence.

Finally, Diamond argues that the parties intended each party to be responsible only for liabilities that arose during its "watch"—that is, during its ownership and operation of the assets. In support of this position, Diamond relies on (a) the affidavits of attorneys involved in drafting the agreement in 1989, twenty-three years before these summary-judgment proceedings; (b) excerpts from the deposition of one of these attorneys; (c) evidence of insurance in effect for the twelve-month period beginning September 1, 1976, thirteen years before the Agreement was drafted; and (d) an email string in which Diamond's attorney stated that a third party was looking for material concerning "potential insurance coverage" that was provided during an unspecified period of time.

We cannot consider the affidavits Diamond cites. The trial court struck this evidence, and that ruling has not been challenged. The trial court did not strike the remaining extrinsic evidence, but that evidence does not affect our analysis. As previously mentioned, the construction of an unambiguous contract is a matter of law for the court, which must construe the contract according to the parties' objective intent as manifested in the contract's language. *See Matagorda Cnty. Hosp. Dist.*, 189 S.W.3d at 740. Extrinsic evidence about the parties' intentions is

17

relevant only if the contract is ambiguous, but if the contract is ambiguous, then its interpretation is a question of fact. Neither party moved for summary judgment on the ground that extrinsic evidence conclusively established the parties' intentions.

We therefore overrule Kaneb's first issue, sustain its second issue, and do not reach its third issue.

## VI. CONCLUSION

Because the Agreement is ambiguous, neither party was entitled to summary judgment. We therefore reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.

/s/      Tracy Christopher
          Justice

Panel consists of Justices Brown, Christopher, and McCally

18