**Affirmed and Memorandum Opinion filed September 25, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00612-CV

**ANDRIUKAITIS-WOODLANDS MEDICAL OFFICE, I, LLC; BARCUS WOODLANDS MEDICAL OFFICE I, LLC; BEHNKEN WOODLANDS MEDICAL OFFICE I, LLC; BEUTEL WOODLANDS MEDICAL OFFICE I, LLC; BOYER WOODLANDS MEDICAL OFFICE I, LLC; CRANE WOODLANDS MEDICAL OFFICE I, LLC; CHRISTENSEN WOODLANDS MEDICAL OFFICE I, LLC; COMSTOCK WOODLANDS MEDICAL OFFICE I, LLC; DOWTY WOODLANDS MEDICAL OFFICE I, LLC; DULING WOODLANDS MEDICAL OFFICE I, LLC; EDBERG WOODLANDS MEDICAL OFFICE I, LLC; HABERER WOODLANDS MEDICAL OFFICE I, LLC; HASHEK WOODLANDS MEDICAL OFFICE I, LLC; HILL WOODLANDS MEDICAL OFFICE I, LLC; HILL G & M WOODLANDS MEDICAL OFFICE I, LLC; KESSLER WOODLANDS MEDICAL OFFICE I, LLC; KUHLMAN WOODLANDS MEDICAL OFFICE I, LLC; LEASK WOODLANDS MEDICAL OFFICE I, LLC; LOVELADY WOODLANDS MEDICAL OFFICE I, LLC; OLSON WOODLANDS MEDICAL OFFICE I, LLC; ROHRBACHER WOODLANDS MEDICAL OFFICE I, LLC; SKINNER WOODLANDS**

**MEDICAL OFFICE I, LLC; TIC WOODLANDS MEDICAL, LLC; TRASKIEWICZ WEBB WOODLANDS MEDICAL OFFICE I, LLC; URMOSSY WOODLANDS MEDICAL OFFICE I, LLC; Y. SUN WOODLANDS MEDICAL OFFICE I, LLC; AND H. CHEN WOODLANDS MEDICAL OFFICE I, LLC, Appellants**

**V.**

**WOODLANDS-NORTH HOUSTON HEART CENTER, PA, Appellee**

---

**On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 2010-49955**

---

## M E M O R A N D U M   O P I N I O N

Appellants, the TIC Owners,[1] challenge a declaratory judgment in favor of appellee Woodlands-North Houston Heart Center, PA (Heart Center). In this declaratory judgment, the trial court declared that the lease agreement executed by the Heart Center's predecessors-in-interest was terminated by a bankruptcy court order. In two related issues, the TIC Owners assert that the trial court erred by (1) declaring the Heart Center lease was terminated by the order of the bankruptcy court, which granted the bankruptcy debtors the authority to reject certain

---

[1] The TIC Owners are Andriukaitis-Woodlands Medical Office, I, LLC; Barcus Woodlands Medical Office I, LLC; Behnken Woodlands Medical Office I, LLC; Beutel Woodlands Medical Office I, LLC; Boyer Woodlands Medical Office I, LLC; Crane Woodlands Medical Office I, LLC; Christensen Woodlands Medical Office I, LLC; Comstock Woodlands Medical Office I, LLC; Dowty Woodlands Medical Office I, LLC; Duling Woodlands Medical Office I, LLC; Edberg Woodlands Medical Office I, LLC; Haberer Woodlands Medical Office I, LLC; Hashek Woodlands Medical Office I, LLC; Hill Woodlands Medical Office I, LLC; Hill G & M Woodlands Medical Office I, LLC; Kessler Woodlands Medical Office I, LLC; Kuhlman Woodlands Medical Office I, LLC; Leask Woodlands Medical Office I, LLC; Lovelady Woodlands Medical Office I, LLC; Olson Woodlands Medical Office I, LLC; Rohrbacher Woodlands Medical Office I, LLC; Skinner Woodlands Medical Office I, LLC; TIC Woodlands Medical, LLC; Traskiewicz Webb Woodlands Medical Office I, LLC; Urmossy Woodlands Medical Office I, LLC; Y. Sun Woodlands Medical Office I, LLC; and H. Chen Woodlands Medical Office I, LLC.

unexpired leases and subleases, and (2) failing to find that the TIC Owners are the current landlords of the Heart Center Lease, which remains valid and enforceable.[2] We affirm.

## BACKGROUND

This case was submitted for a bench trial on an agreed statement of facts and exhibits (the Agreed Statement of Facts). These background facts are compiled from the Agreed Statement of Facts provided to the trial court.

In 2002, Lantern Bend Medical Plaza, Ltd. (LBMP) owned the property at issue (the Plaza). The Plaza is a building with a total of 48,750 square feet of office space. On October 17, 2002, LBMP and the predecessors-in-interest to the Heart Center executed a fifteen-year lease for office space in the Plaza (the Heart Center Lease). On February 26, 2007, LBMP sold the Plaza to FOR 1031 Woodlands Medical Office I, LLC (FOR 1031). The next day, FOR 1031, as the new owner, simultaneously leased the Plaza (the Master Lease[3]) to DBSI Woodlands Medical Offices I LeaseCo LLC (DBSI Woodlands) and sold its own interest in the Plaza to appellants, the TIC Owners, who presently own the Plaza. In November 2008, numerous DBSI entities, including DBSI Woodlands, filed a petition for Chapter 11 bankruptcy in Delaware. The petitioners requested that the proceedings be jointly administered. On February 2, 2009, the TIC Owners

---

[2] Appellants also urge that the trial court erred in considering argument about factual matters outside the agreed case as submitted by the parties. Because our *de novo* review of this case is based solely on the agreed statement of facts, the agreed exhibits, and the appropriate legal authorities, and because the argument of counsel is not evidence, whether the trial court considered matters outside the record is of no moment to this appeal.

[3] This NNN lease is a "triple net" lease wherein the lessee is responsible for all "operating expenses," including maintenance, property taxes, and insurance, and the lessor(s) is not responsible for any of these expenses.

3

entered into an Amended and Restated Master Lease Agreement with TNPPM Woodlands, LLC.

On February 4, the Delaware Bankruptcy Court entered an "Order (Omnibus) Granting Authority to Reject Certain Unexpired Leases of Non-Residential Real Property, Subleases and/or Other Agreements Pertaining to Real Property and Executory Contracts Effective as of January 30, 2009" (the Bankruptcy Order). In this order, the bankruptcy court approved the various DBSI entities' rejection, effective January 30, 2009, of numerous master leases, subleases and executory contracts set forth in Exhibits I and II attached to the order. Exhibit I to the Bankruptcy Order specifically lists "Woodlands Medical (Lantern Bend)" as a master lease. Exhibit II identifies the Heart Center Lease as a "Sublease[] to be Rejected." The bankruptcy court's order further states that

> [n]othing herein shall be construed as a determination, nor as an acknowledgment or agreement on the part of any party, that (a) the applicable Debtor[s'] interest in any agreement referred to as a "sublease" is, in fact, a sublease, (b) that such agreement constitutes property of the Debtors' estate, or (c) that rejection of the Masterleases, Subleases or Contracts hereunder shall have any impact on any agreement between non-debtor parties, nor shall anything herein impair, prejudice or affect, in any way, any rights of parties to such "subleases" from seeking recovery of any obligation arising from year-end reconciliations from any parties to such "subleases" or assignees or designees of any such parties.

A dispute arose between the Heart Center and the TIC Owners about the effect of the Bankruptcy Order. The Heart Center asserted that the Bankruptcy Order terminated the Heart Center Lease; the TIC Owners contended that the Bankruptcy Order did not terminate the Heart Center Lease. The Heart Center filed a petition for declaratory relief in the trial court in August 2010, seeking a

4

declaration that the Bankruptcy Order terminated the Heart Center Lease.[4]  The trial court signed a judgment on June 21, 2013, in favor of the Heart Center.  In this judgment, the trial court declared that the Heart Center Lease was terminated by the Bankruptcy Order as of January 30, 2009.  The trial court also signed findings of fact and conclusions of law, incorporating the agreed statement of facts into its findings and concluding that the Heart Center Lease was terminated by the Bankruptcy Order.  This appeal timely followed.

## ANALYSIS

### A.    Standard of Review

Although the record in this case contains an agreed statement of facts on which the parties had a bench trial, the record does not contain an agreed statement certified by the trial court to be correct.  *See* Tex. R. Civ. P. 263 (requiring a signed agreed statement to be certified by the trial court to be correct).  But strict compliance with this rule is not required, and when, as here, the record indicates the trial court heard the case on stipulated facts, we may treat the case as one involving an agreed statement of facts under Rule 263.  *Taylor v. First Comm. Credit Union*, 316 S.W.3d 863, 866 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

We review a case tried on agreed facts de novo. *See Panther Creek Ventures, Ltd. v. Collin Cent. Appraisal Dist.*, 234 S.W.3d 809, 811 (Tex. App.—Dallas 2007, pet denied).  The agreed stipulations are binding on the parties, the trial court, and the reviewing court. *Id.*  We presume that the parties have brought before the court all facts necessary for the presentation and adjudication of the case.  *Amaro v. Wilson Cnty.*, 398 S.W.3d 780, 784 (Tex. App.—San Antonio

---

[4] Pending the outcome of this dispute, the Heart Center has continued to pay rent for the premises it leased in the Plaza.

5

2011, no pet.). We do not review the legal or factual sufficiency of the evidence. *Id.* "In an appeal from a trail court's judgment on an agreed case, the only issue on appeal is whether the trial court properly applied the law to the agreed facts." *Taylor*, 316 S.W.3d at 866.

**B.     Arguments Asserted by the TIC Owners**

We begin by narrowing the focus of the issues before this court. First, we need not decide whether the Bankruptcy Order terminated the Master Lease when it authorized rejection of that lease because the parties agree that that the Bankruptcy Order terminated the Master Lease. Therefore, the parties agree that the Bankruptcy Order ended the relationship between the TIC Owners and DBSI Woodlands—a relationship created by the Master Lease. The parties further agree that the Bankruptcy Order ended the relationship between DBSI Woodlands and the Heart Center—a relationship also created by the Master Lease. The parties agree that the TIC Owners still own the Plaza, part of which premises are the subject of the Heart Center Lease. The parties also agree that the Heart Center Lease is not specifically mentioned in the Master Lease. Even so, the parties agree that the TIC Owners transferred at least some of their rights in the Heart Center Lease to DBSI Woodlands pursuant to the terms of the Master Lease. Finally, the parties agree that the Bankruptcy Order specifically authorized the rejection of the Heart Center Lease.

Nevertheless, by their issues on appeal, the TIC Owners urge that the Bankruptcy Order did not terminate the Heart Center Lease. As such, the TIC Owners contend that the Heart Center Lease remains a valid and enforceable lease between the TIC Owners, as lessors, and the Heart Center, as lessee. They have three bases for this proposition, although their arguments are presented in two separate issues. First, as part of their first issue, the TIC Owners assert that if we

6

construe the provisions of the Master Lease harmoniously, we must conclude that the parties to that lease contemplated that, in the event of its termination, the TIC Owners, as successors to FOR 1031, would substitute for DBSI Woodlands as landlords. Next, also as part of their first issue, they argue that their "reversionary interest" in the Master Lease was triggered by the Bankruptcy Order's termination of the Master Lease, which amounted to a breach of that lease, and thus, the Heart Center Lease reverted to the TIC Owners because it was not absolutely assigned to DBSI Woodlands. The TIC Owners contend in their second issue that the Master Lease actually did not assign the Heart Center Lease to DBSI Woodlands and that instead, the TIC Owners themselves were the landlords under the Heart Center Lease. We address each of these arguments in turn.

## C.    The TIC Owners Did Not Become the Landlords of the Heart Center When the Master Lease Was Terminated.

Determination of this issue requires us to construe the terms of the Master Lease. In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the document. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 465 (Tex. App.—Houston [14th Dist.] 2013, no pet.). We consider the entire contract and try to harmonize and give effect to all its provisions by analyzing the provisions with reference to the entire agreement. *Webster*, 128 S.W.3d at 229; *NuStar Energy*, 402 S.W.3d at 466. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F. Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex.1987)). If, after the appropriate rules of construction have been applied, the contract can be given a definite or certain legal

meaning, it is unambiguous and we construe it as a matter of law. *Id.* The interpretation of an unambiguous contract is a question of law we review de novo. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999).

### 1. Paragraphs 2 and 19 of the Master Lease do not create a "reversionary interest" in the Heart Center Lease.

Courts often analogize ownership of real property to a bundle of sticks in which each stick represents a particular right regarding the property. *E.g.*, *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 634 (Tex. 2004) (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 393 (1994)). The right to occupy all or part of the property is one of the sticks in the bundle. *See U.S. v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945) (explaining that "property" denotes the group of rights "to possess, use and dispose of it"). Although a lease transfers the right to occupy stick to the tenant/lessee, a right to reenter and repossess the property on default of rental payments is a landlord's—or property owner's— "contingent reversionary interest." *See 718 Assocs., Ltd. v. Sunwest N.O.P., Inc.*, 1 S.W.3d 355, 361 (Tex. App.—Waco 1999, pet. denied).

The TIC Owners identify several portions of the Master Lease to support their claim that they automatically became the landlords of all subleases or assignments of the Master Lease upon its rejection by the Bankruptcy Order. They assert that these portions of the Master Lease are "consistent with the right of reentry and reversionary right contained" in the lease. However, we disagree that these paragraphs, construed harmoniously, support the TIC Owners' claim that they automatically became the landlords of the Heart Center Lease upon the termination of the Master Lease.

8

From Paragraph 2(a), they quote the following:

> Upon termination of the Lease, if all or any part of the Leased Premises are then assigned or sublet, LESSOR agrees to recognize such assignment or sublease provided no default or even that, with the passage of time or giving of notice or both, would constitute a default then exists under such assignment or sublease.

This language simply requires the TIC Owners, as lessors, to recognize any non-defaulted assignments or subleases in existence when the Master Lease terminates. There is nothing in the language that suggests any reversionary right, such as a right to reenter and repossess the assigned or sublet premises.

From Paragraph 19(b), the TIC Owners quote language concerning the requirement that any sublease entered into under the terms of the Master Lease must include provisions requiring the sublessee, in the event of any default or termination of the Master Lease, to (a) "attorn to and recognize" any new landlord of the leased premises and (b) waive any provision provided by statute or "rule of law" that could terminate the sublease or give the sublessee the right to elect to terminate the sublease. Although this paragraph may provide some reversionary rights to the TIC Owners, it explicitly applies to a sublease of the premises "entered into after the date hereof," i.e., after the "Commencement Date" of the Master Lease. The Heart Center Lease, however, indisputably predates the Master Lease. Thus, this paragraph and the language quoted by the TIC Owners do not apply to the Heart Center.[5]

---

[5]The other reversionary rights identified by the TIC Owners in the Master Lease are rights as *between the TIC Owners and DBSI Woodlands*, such as the TIC Owners' remedies in an event of default. For example, under Paragraph 23(a), the TIC Owners have the right to terminate the Master Lease and "enter upon and take possession of the Leased Premises" by force in the event of a default by DBSI Woodlands.

Nevertheless, the TIC Owners urge that construing these paragraphs "harmoniously" operates to extend Paragraph 19(b)(ii) to not only leases entered into by DBSI Woodlands subsequent to the execution of the Master Lease, but also to "those leases which were in existence at the time the Masterlease was executed." The TIC Owners' conclusion does not follow from the paragraphs quoted. There is simply no connection between Paragraph 2's language and the purported reversionary interest identified in Paragraph 19, and the TIC Owners do not explain how the two are connected, other than to state so in a conclusory fashion.

In short, although we consider the entire contract and attempt to harmonize and give effect to all its provisions, we must not give a contract "a meaning different from that which its language imports." *NuStar Energy*, 402 S.W.3d at 466 (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curaim)). Extending Paragraph 19(b)(ii) to the Heart Center Lease would require us to give the Master Lease a meaning different from what its language imports. The clear and unequivocal language of the Master Lease indicates that Paragraph 19(b)(ii), the only provision identified by the TIC Owners as providing a "reversionary" interest to them, does not apply to the Heart Center Lease because this lease was entered into *before* the commencement date of the Master Lease.

For the foregoing reasons, we overrule this portion of the TIC Owners' first issue.

### 2. Nature of the Heart Center Lease assignment does not compel reversion of this lease to the TIC Owners.

The TIC Owners acknowledge that the following language of the Master Lease at least purports to assign the Heart Center Lease because the Heart Center Lease was in existence at the time the Master Lease was executed:

> LESSOR [FOR 1031 and the TIC Owners] grants, conveys, assigns and transfers to [DBSI Woodlands] any and all right title and interest of [FOR 1031 and the TIC Owners], as landlord or otherwise, in and to all leases of the Leased Premises existing as of the Commencement Date for the remaining term and all extensions thereof and to all the rents set forth therein relating to the period from and after the Commencement Date until the expiration or termination of this Lease. [DBSI Woodlands] hereby accepts, assumes and agrees to perform all of the terms, covenants and conditions of such leases required to be performed by landlord from and after the Commencement Date until the expiration or termination of this Lease.

The TIC Owners assert, and we agree, that the assignments pursuant to this paragraph are assignments for a term—i.e., until the termination of the Master Lease. We do not agree, however, that simply because the Heart Center Lease was assigned to DBSI Woodlands for a term that it necessarily reverted to the TIC Owners when DBSI Woodlands simultaneously rejected both the Master Lease and the Heart Center Lease.

We begin by noting that the TIC Owners direct us to *Vara-Portofino Tech Center L.L.C. v. Sandvik Mining & Construction USA, L.L.C.*, as a case that may be "informative" to our determination of this dispute. No. H-09-2376, 2009 WL 4263975, at *6–7 (S.D. Tex. Nov. 25, 2009). In that case, which involved the same bankruptcy proceedings as are involved here and in which standing to sue was the issue, the Southern District of Texas concluded that, because the plaintiffs retained a right to reenter and repossess the property on default of rental payment under the terms of the Master Lease, a lease that purportedly had been assigned to the DBSI entity did not become a sublease and was not released by a bankruptcy order releasing the Master Lease. *Id.* at *7. Importantly, there is nothing in *Vara-Portofino* indicating that the sublease at issue had been rejected through the bankruptcy proceedings, as happened here. *See id.* at *1–8. Thus, this case is readily distinguishable: the Heart Center Lease was explicitly listed as a sublease

11

to be rejected as part of the Bankruptcy Order. We therefore do not find the Southern District of Texas's determination informative of the issues before us.

The TIC Owners assert that the Master Lease was rejected by the bankruptcy trustee, which resulted in a pre-petition breach of the Master Lease. *See, e.g.*, 11 U.S.C. § 365(g)(1); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996). This breach, according to the TIC Owners, permitted them to exercise any of the remedies for default detailed in the Master Lease, including termination of the Master Lease.[6] Their argument that they

---

[6] However, there is nothing in the agreed statement of facts that establishes an event of default under the Master Lease.

In Paragraph 22, the following are "deemed to be events of default" by DBSI Woodlands, the lessee:

(a) LESSEE shall fail to pay within 5 days of when due any installment of Rent or any other payment required pursuant to this Lease. . . .

(b) LESSEE shall abandon any substantial portion of the Leased Premises.

(c) LESSEE shall fail to comply with any term, provision or covenant of this Lease, other than payment of the Rent and obtaining the required policies of insurance, and the failure is not cured within 60 days after written notice to LESSEE.

(d) LESSEE shall file a petition or be adjudged bankrupt or insolvent under the Bankruptcy Code, 110 U.S.C. Section 10.1 et seq., as amended and in effect from time to time, or any similar law or statute of the United States or any State; or a receiver or trustee shall be appointed for all or substantially all of the assets of LESSEE; or LESSEE shall make a transfer in fraud of creditors.

(e) LESSEE shall do or permit to be done an act which results in a lien being filed against the Leased Premises or any portion of the Leased Premises.

The TIC Owners assert that several "events of default" occurred: "When DBSI [Woodlands] ceased performing under the DBSI Masterlease a term of default occurred. When DBSI [Woodlands] filed bankruptcy a term of default occurred." But there is nothing in the Agreed Statement of Facts to support the TIC Owners' claim that DBSI Woodlands "ceased performing" under the Master Lease (other than the filing for bankruptcy). Regarding subsection (d), such clauses are referred to as "*ipso facto* clauses" because they "automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy." *In re Enron Corp.*, 306 B.R. 465, 462 (Bankr. S.D.N.Y. 2004) (quoting *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 832–33 (Bankr. S.D.N.Y. 1996)). Such clauses are generally unenforceable under the Bankruptcy Code. *See id.* (citing 11 U.S.C. § 365(e)(1), which prohibits

12

terminated the Master Lease is belied by the Agreed Statement of Facts: On February 2, 2009, the TIC Owners entered into an "Amended and Restated Master Lease Agreement with TNPPM Woodlands. This lease explicitly states that the DBSI Woodlands' Master Lease "continues in existence as of [February 2, 2009]." Further, rather than identifying the contractual remedy for default upon which they rely under the Master Lease, the TIC Owners cite to cases regarding the distinction between assignments and subleases.[7] They assert that because the Heart Center Lease was a sublease, rather than an assignment, they retained a contingent reversionary interest in it. But this argument, in turn, relies on the notion that the Heart Center Lease is subject to Paragraph 19 of the Master Lease, an argument that we have already rejected.[8]

termination of executory contracts or leases after commencement of the bankruptcy proceeding based on such provisions). Thus, although this contractual "event of default" is supported by the Agreed Statement of Facts, this clause is unenforceable under the Bankruptcy Code. *See id.* It cannot support the TIC Owners' assertion that an event of default entitling them to the remedies for default under the Master Lease occurred.

[7] These cases stand for the proposition that when a *tenant* retains a right to renter and repossess the premises upon default, a sublease is created rather than an assignment. *See, e.g.*, *718 Assocs., Ltd. v. Sunwest N.O.P., Inc.*, 1 S.W.3d 355, 360–61 (Tex. App.—Waco 1999, pet. denied).

[8] We note that the TIC Owners cite to numerous cases in their analysis of this issue. However, their arguments are unclear, repetitive, and conclusory. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a *clear and concise argument* for the contentions made, with appropriate citations to authorities and to the record."); *see also Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931–32 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (stating that our briefing requirements are not met by "merely uttering brief, conclusory statements unsupported by legal citations"; that the failure to provide substantive analysis of the legal issues results in waiver of the complaint; and that the appellant failed to meet this requirement because her brief consisted "of a series of disjointed factual assertions and cryptic complaints."). As an example, the majority of the argument asserted on pages 21–22 of the TIC Owners' brief is repeated verbatim on pages 27–28. Although we have made our best effort to address the contentions made by the TIC Owners, the nature of their briefing has made our analysis difficult because we cannot readily determine the relationship between their assertions, their cited authorities, and, most importantly, their conclusions.

13

In short, the TIC Owners have failed to explain how the terms and provisions of the Master Lease compel the reversion of the Heart Center Lease to them. *Cf. Chatlos Sys., Inc. v. Kaplan*, 147 B.R. 96, 100 (Bankr. D. Del. 1992) (explaining that when a primary lease is rejected by the bankruptcy court, any underlying subleases are likewise rejected because "the sublessee's rights in the property extinguish with those of the sublessor"). Accordingly, we overrule the entirety of the TIC Owners' first issue.

## D. Heart Center Lease Was Assigned to DBSI Woodlands

In their final issue, the TIC Owners assert that the trial court erred in declaring the Heart Center Lease terminated because they, not DBSI Woodlands, were the landlords of this lease based on the chain of conveyances of the property. They base their arguments on cases holding that a deed passes whatever interest the grantor has in the land, unless it contains language showing the intention to grant a lesser estate. *E.g.*, *Eastin v. Dial*, 288 S.W.3d 491, 500 (Tex. App.—San Antonio 2009, no pet.) ("A deed must be construed to confer upon the grantee the greatest estate that the terms of the instrument will permit. A deed will pass whatever interest the grantor has in the land, unless it contains language showing the intention to grant a lesser estate." (citations omitted)).

But the TIC Owners ignore the fact that, as lessors/owners of the Plaza, they assigned their interest in the Heart Center Lease to DBSI Woodlands. The Master Lease recites FOR 1031's intent to sell tenant-in-common interests in the Plaza property. And the Master Lease defines "Lessor" as:

> FOR 1031 Woodlands MedicalOffice I, LLC, a Delaware limited liability company (LLC), the current owner or contract buyer of the Leased Premises (as defined below), and *all future owners of tenant in common interests* in the Lease Premises.

14

(emphasis added). The Master Lease further provides, "All references to 'LESSOR' herein shall mean, collectively, [FOR 1031], each Purchaser of the Leased Premises and their successors and assigns."

As noted above, the lessors—both FOR 1031 and the TIC Owners—under the Master Lease assigned, conveyed, and granted to DBSI Woodlands "any and all right, title, and interest . . . *as landlord or otherwise* . . . in and to all leases" of the Plaza existing as of its commencement date (emphasis added). DBSI Woodlands accepted and agreed to the assignment of these leases. It is undisputed that the Heart Center Lease was one of the leases that existed as of the commencement date of the Master Lease; thus, under the plain language of the Master Lease, DBSI Woodlands was assigned the Heart Center Lease by *both* FOR 1031 *and* the TIC Owners. *See NuStar Energy, L.P.*, 402 S.W.3d at 465–66. As such, we cannot agree that the TIC Owners remained the lessors under the Heart Center Lease. Through the clear and unambiguous terms of the Master Lease, the TIC Owners assigned this lease to DBSI Woodlands, regardless of whether the Heart Center is deemed a sublessee or a lessee of DBSI Woodlands.[9]

Under these circumstances, we overrule the TIC Owners second issue.

## E. Effect of the Bankruptcy Order on the Heart Center Lease

As previously outlined, the Delaware Bankruptcy Court entered the Bankruptcy Order, approving the rejection of numerous master leases, subleases, and executory contracts, including the Master Lease and the Heart Center Lease. We have already discussed and rejected the TIC Owners' various arguments regarding why the Bankruptcy Order did not end the contractual relationship

---

[9] We note that, during oral argument, the TIC Owners conceded that, if there had been no bankruptcy proceedings, DBSI Woodlands—and only DBSI Woodlands—would have had the right to terminate the Heart Center Lease if it so chose.

15

between them and the Heart Center. Now, we consider whether the bankruptcy court's approval of the rejection of the Heart Center Lease permitted the Heart Center to terminate this lease. *See Taylor*, 316 S.W.3d at 866 (providing that, in an appeal from a case with agreed facts, the only issue is whether the trial court properly applied the law to the agreed facts). We conclude that it does for the following reasons.

With the bankruptcy court's approval, a trustee of a bankruptcy debtor or a debtor in possession "may assume or reject any . . . unexpired lease of the debtor." 11 U.S.C. § 365(a).[10]

> "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994). The Code states that, except in certain narrowly circumscribed instances, rejection of an executory contract or lease constitutes a material breach. 11 U.S.C. § 365(g). As a legal fiction, such a breach is deemed to have occurred on the day immediately prior to the commencement of the bankruptcy so rejection claims are treated as prepetition claims, 11 U.S.C. §§ 365(g)(1) & 502(g), and because the parties' rights are deemed prepetition, state law governs the rights stemming from the breach.

*Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996). In Texas, "[i]t is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). Additionally, a party to a contract may elect to terminate it and be excused from performance of any

---

[10] Although this section speaks only of a trustee, a debtor in possession is given the same powers pursuant to section 1107 of the Bankruptcy Code. *See* 11 U.S.C. § 1107.

executory obligation if the other party commits a material breach. *See A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 676 (Tex. App.—Austin 2003, pet. denied).

It is undisputed that the Heart Center Lease was rejected by the bankruptcy court. This rejection, in turn, constituted a prepetition material breach of the Heart Center Lease by DBSI Woodlands. *See* 11 U.S.C. § 365(g)(1); *Stewart Title*, 83 F.3d at 741. Because of this material breach, the Heart Center, as *lessee* under the Heart Center Lease, was entitled to treat the lease as terminated.[11] *See* 11 U.S.C. § 365(h)(1)(A)(i) (permitting a lessee to treat a debtor's lease that has been rejected by a bankruptcy trustee as terminated); *Stewart Title*, 83 F.3d at 741; *see also A.G.E., Inc.*, 105 S.W.3d 676; *Giddings Petroleum Corp. v. Peterson Food Mart, Inc.*, 859 S.W.2d 89, 93 (Tex. App.—Austin 1993, no writ) ("The weight of federal authority holds that the trustee's rejection of an executory contract or lease effectively terminates the contract or lease."). There is no such similar provision entitling a *lessor* to terminate a lease based on a bankruptcy court's rejection of a lease. Further, as discussed above, the TIC Owners had not terminated the Master Lease in this case as of February 2, 2009, when they entered into an amended and restated master lease with a different lessee. We thus conclude that, although both leases were rejected at the same time pursuant to the Bankruptcy Order, the Heart Center Lease terminated before the TIC Owners terminated the Master Lease. *See* 11 U.S.C. § 365(h)(1)(A)(i); *Stewart Title*, 83 F.3d at 741; *see also A.G.E., Inc.*, 105 S.W.3d 676; *Giddings Petroleum Corp.*, 859 S.W.2d at 93.

---

[11] The parties' agreed facts show that the Heart Center, as lessee, treated the Heart Center Lease as terminated. The Heart Center (a) refused to execute the attornment agreement by which the lease would contractually continue; (b) sought declaratory judgment that the lease was terminated; and (c) continued to make monthly rental payments "subject to" its right to its declaratory judgment action.

Based upon the Agreed Statement of Facts and the appellate issues presented by the TIC Owners, we conclude that the trial court properly declared that the Heart Center Lease was terminated.

## CONCLUSION

The TIC Owners have failed to establish any basis for reversing the trial court's judgment. Having overruled each of the TIC Owners issues on appeal, we therefore affirm the trial court's judgment.

/s/    Sharon McCally
       Justice

Panel consists of Justices Christopher, Jamison, and McCally