# Supreme Court of Texas

═══════════
No. 19-0612
═══════════

Mosaic Baybrook One, L.P., and Mosaic Baybrook Two, L.P.,

*Petitioners*,

v.

Paul Simien,

*Respondent*

═══════════════════════════

On Petition for Review from the
Court of Appeals for the First District of Texas

═══════════════════════════

*~ consolidated for oral argument with ~*

═══════════
No. 21-0159
═══════════

Mosaic Baybrook One, L.P.; Mosaic Baybrook Two, L.P.; and
Mosaic Residential, Inc.,

*Petitioners*,

v.

Paul Simien,

*Respondent*

**Argued September 21, 2022**

JUSTICE BUSBY delivered the opinion of the Court, in which Justice Lehrmann, Justice Boyd, Justice Devine, and Justice Young joined.

JUSTICE BLAND filed a dissenting opinion, in which Chief Justice Hecht, Justice Blacklock, and Justice Huddle joined.

These two interlocutory appeals arise from a single suit by respondent Paul Simien against his landlords, petitioners Mosaic Baybrook One, L.P., Mosaic Baybrook Two, L.P., and Mosaic Residential, Inc. (collectively, "Mosaic").[1] Their dispute concerns a "Water/Sewer Base Fee" that Mosaic billed tenants each month to recover certain amounts it had paid the municipal utility district. This fee included not only (1) each apartment's allocated portion of the utility's customer service charge for water and sewer service, but also (2) an undisclosed amount equivalent to part of the utility's charges for non-water emergency services.

Simien sued Mosaic under the Water Code on behalf of a tenant class, alleging that this practice "violate[d] [administrative rules]

---

[1] Mosaic Baybrook One, L.P., and Mosaic Baybrook Two, L.P., each owned one of the two parcels of land on which Simien's apartment complex was located. Mosaic Residential, Inc. served as the management company and employed the relevant personnel for Mosaic's operations at Simien's complex.

regarding submetering of utility service . . . or nonsubmetered master metered utility costs." TEX. WATER CODE § 13.505.[2] Among other things, the rules provide that "[c]harges billed to tenants for submetered or allocated utility service may only include bills for water or wastewater from the retail public utility." 16 TEX. ADMIN. CODE § 24.124(a).[3]

In its first appeal (No. 19-0612) ("*Simien 1*"), Mosaic challenges the trial court's grant of Simien's motion for partial summary judgment on liability, as well as the court's subject-matter jurisdiction over Simien's requests for particular elements of damages. We conclude the trial court has jurisdiction because at least some damages are available for this statutory claim. And we affirm the partial summary judgment because Simien's lease did not authorize Mosaic to charge him for non-water emergency services. Mosaic overcharged Simien in violation of the statute and rules by including undisclosed non-water charges Simien did not owe in the base fee it billed him for water and wastewater utility service.

---

[2] In 2017, several months after Simien filed suit, the Legislature amended section 13.505 of the Water Code. Except where otherwise indicated, any citations to section 13.505 of the Water Code in this opinion refer to the pre-amendment version of that statute that became effective on September 1, 2013. Act of May 13, 2013, 83d Leg., R.S., ch. 171, § 83, 2013 Tex. Gen. Laws 772, 809-10 (amended 2017) (current version at TEX. WATER CODE § 13.505).

[3] After Simien filed suit, the applicable PUC rules were renumbered and recodified using substantially identical language. *See* 39 Tex. Reg. 2667, 2718, *et seq.* (2014), *adopted by* 39 Tex. Reg. 5903 (2014), *amended by* 43 Tex. Reg. 6826 (2018) (now codified at 16 TEX. ADMIN. CODE §§ 24.275, *et seq.*). For consistency with the parties' briefing, we refer to the pre-amendment numbering of the relevant PUC rules.

In its second appeal (No. 21-0159) ("*Simien 2*"), Mosaic challenges Simien's standing and argues that the trial court abused its discretion by certifying a class under Rule 42 of the Texas Rules of Civil Procedure. We hold that Simien has standing because he paid the fee.

As to class certification, Mosaic's primary challenge is that the trial court did not conduct a rigorous analysis and significantly misunderstood the law because Simien's claim fails on the merits. But the merits are relevant only to the extent a rigorous analysis shows that the claim is legally baseless or that the court misunderstood the law in some other manner that affects the requirements for class certification. Here, we have affirmed the partial summary judgment for Simien, and Mosaic has identified no other disputed legal issue regarding its claim that could have a significant effect on any certification requirement.

Mosaic also argues that the trial court's order failed to address its defenses. But the court disposed of all but one defense prior to certification, and it accounted for the remaining defense of limitations in setting the class period. We therefore affirm the certification order.

## FACTUAL AND PROCEDURAL BACKGROUND

Mosaic operates as the corporate landlord of various properties, including the Baybrook Village apartments, a residential apartment complex near Houston that includes over 700 apartment units. Mosaic has owned and managed Baybrook Village since May 2015.

4

In July 2015, Mosaic hired RealPage Utility Management ("RealPage")[4] to prepare monthly statements for the tenants of Baybrook Village. As part of that process, Mosaic sent RealPage a sample lease used by prior management. Mosaic carried forward most of the sample lease's terms in the leases it signed with Simien and other tenants. Some of the changes Mosaic made to the sample lease are relevant in evaluating the parties' positions about whether the leases authorize Mosaic to charge Simien for fire, EMS, and law enforcement services. We therefore examine the leases in some detail.

### A.     The leases

Paragraph seven of the sample lease provided that the landlord would pay for certain items, if checked, and the tenant would "pay for all other utilities and services." The sample lease also included a "LEASE ADDENDUM FOR ALLOCATING SERVICES AND GOVERNMENTAL FEES," which contained the following statement in paragraph two:

> Reason for allocation. Apartment owners receive bills for services provided to residents and charges for various governmental fees. These are direct costs that the apartment community incurs. In order to help control the cost of rent, we have chosen to allocate the services and governmental fees indicated below through an allocated bill using a standardized formula to distribute those costs fairly.

---

[4] Mosaic actually contracted with Velocity Utility Management, Inc., a separate entity that later became part of RealPage. We use "RealPage" to refer to both entities.

Paragraph three of the addendum then provided that the landlord "will allocate the following services and governmental fees," and it printed various types of fees with a box that could be checked by each to indicate if that particular fee would be allocated to tenants. The box for "Emergency services fee" was not checked. Paragraph three also included some blank lines on which other types of fees could be written in and checked. In the sample lease, the following fees were written in and checked: (1) "Pest Control Fees $3.50 mo"; (2) "Law Enforcement Fee. $4.29 mo"; (3) "Water Fire Protection $8.05mo"; and (4) "Ambulance Fee $1.40mo."

In advising RealPage how to set up billing for new tenants and lease renewals, Mosaic sent an e-mail instructing RealPage to "disregard the ambulance, law enforcement, etc., it's all included in the water/sewer." In response, RealPage requested that Mosaic "remove the below from the Government Fees addendum" and indicated that RealPage's billing "[s]etup" for Baybrook Village would include a "Water/Sewer Base Fee" that "will include minimum [water/sewer] charges from [the municipal utility district] plus Law Enforcement, Ambulance, & Fire Protection." Thus, RealPage said it was "going to include all those fees as one charge, within the water and sewer base fees." The e-mail also included a header entitled "Remove:" followed by an image of the four fees that had been written in and checked in the sample lease.

In June 2016, Simien signed a lease with Mosaic for an apartment at Baybrook Village with an initial lease term of July 1, 2016, to July 31, 2017. Like the sample lease, Simien's lease included a "LEASE

6

ADDENDUM FOR ALLOCATING SERVICES AND GOVERNMENT FEES," and the box for allocating an "Emergency services fee" was not checked. Unlike the sample lease, paragraph three of the addendum in Simien's lease includes only three fees that are written in and checked: (1) "Pest Control Fees $3.50 mo"; (2) "Convergent Billing Fee $3.50"; and (3) "valet trash $25.00." Fees for law enforcement, ambulance, and fire service were not written in.

###    B.    The tenants' monthly account statements

For each month that he lived at Baybrook Village, Simien received a residential account statement from Mosaic, which RealPage generated as follows. As reflected in its rate orders, Harris County Municipal Utility District 55 ("the MUD") imposed various rates and charges for the services it provided customers, including a monthly service charge, a monthly water service rate, a monthly sewer service rate, a monthly fire protection rate, a monthly emergency medical service rate, and a monthly law enforcement service rate. For Baybrook Village, the MUD billed those amounts to Mosaic's accounts[5] and sent separate monthly invoices for the services provided to each building directly to Mosaic. The monthly invoice that Mosaic received from the MUD for each building assessed fees in lump sums on a building-wide basis with itemized subtotals listed for (1) "WATER"; (2) "SEWER"; (3) "LAW ENF FEE"; (4) "SERVICE CHARGE"; (5) "FIRE"; and

---

[5] After the old management company "finaled" its account, the MUD restarted a new account for Mosaic for the Baybrook Village complex. Mosaic had multiple account numbers with the MUD, each of which corresponded to a different range of numbered apartment units at Baybrook Village.

7

(6) "EMS FEE." Mosaic then sent those invoices to RealPage to prepare the residential account statements that were sent to each tenant.

RealPage was responsible for calculating each tenant's portion of the line items for "WATER" and "SEWER" listed in the MUD invoices. RealPage combined those two amounts and listed the sum on the tenant's monthly account statement as a single line item for "Water/Sewer."

RealPage was also responsible for calculating each tenant's portion of the line items for "LAW ENF FEE," "SERVICE CHARGE," "FIRE," and "EMS FEE" listed in the MUD invoices, which it did as follows. RealPage divided each of the line items by the number of apartment units in the building. RealPage then combined those four amounts and listed the total on each tenant's monthly account statements as a single line item labeled "Water/Sewer Base Fee"—the item in dispute.

Each month, Simien received a residential account statement that listed total amounts due for "Property Charges" and "Billed Charges." The "Billed Charges" were further broken out into line-item subtotals for (1) "Water/Sewer Base Fee"; (2) "Water/Sewer"; (3) "Pest Control"; and (4) "Trash." Simien regularly paid Mosaic's "Water/Sewer Base Fee" each month until his lease ended in September 2017. Throughout Simien's residence at Baybrook Village, Mosaic and RealPage assessed a uniform "Water/Sewer Base Fee" on each apartment every month. RealPage stopped preparing bills for Baybrook Village at some point in 2018 after advising Mosaic in January of that year that the charges labeled collectively as "Water/Sewer Base Fee"

8

should not be lumped together. But Mosaic continued to use the same format and line-item descriptions on every tenant's residential account statement until at least December 2018.

## C. Simien's suit and the parties' pleadings

On February 6, 2017, Simien filed a class action petition and jury demand against Mosaic. Simien alleged that he routinely paid Mosaic over $50 per month in water and sewer charges when his actual charges should have been approximately $17 less. Simien alleged that Mosaic had violated the Water Code and applicable Public Utility Commission ("PUC") rules by assessing and collecting water and sewer base fees in excess of the actual water and sewer base fee that the MUD imposed on Mosaic. Simien sought the statutory remedies that section 13.505 of the Water Code provided for tenants at that time, which include three times the amount of all overcharges, a civil penalty of one month's rent for each class member for each violation, and reasonable attorney's fees.

Mosaic filed its answer on March 3, 2017. In addition to generally denying Simien's allegations, Mosaic asserted several affirmative defenses, including the statute of limitations under section 16.003(a) of the Civil Practice and Remedies Code.[6]

After amendments to section 13.505 (which we discuss later) became effective in mid-2017, Mosaic specially excepted to Simien's petition, contending that the amendments applied retroactively to Simien's still-pending claims. Mosaic asked the trial court to strike from Simien's live pleading all allegations relating to remedies that did not

---

[6] Mosaic also asserted as affirmative defenses challenges to Simien's standing and the trial court's subject-matter jurisdiction.

survive the amendments to section 13.505. Alternatively, Mosaic argued the trial court should dismiss Simien's claims because they were based on alleged violations that fall under the PUC's exclusive jurisdiction post-amendment. Following a hearing, the trial court overruled the special exceptions and denied the motion to dismiss in March 2018.

### D. Summary judgment proceedings

Simien filed a traditional motion for partial summary judgment in June 2018. He asserted that charging tenants the fire, EMS, and law enforcement fees violated the Water Code and the PUC's rules, resulting in an overcharge for which Simien and the class may recover under section 13.505. Simien argued that recovery was warranted regardless of whether the violation was viewed as charging the fees at all or packaging them as part of a "base fee" that included both water and non-water related charges. Simien asked the trial court to hold that Mosaic had (1) violated the Water Code and PUC Rules as a matter of law, and (2) "overcharged" Simien under section 13.505 in the amount of $16.67 per month.

In response, Mosaic argued that Simien's claim for overcharges failed as a matter of law. In Mosaic's view, the "Water/Sewer Base Fee" on the tenant bill was just a misnomer for otherwise permissible charges for fire, EMS, and law enforcement services, which were not regulated by Chapter 13 of the Water Code or PUC rules.

Following a hearing, the trial court signed its initial order granting Simien's motion for partial summary judgment on September

10

10, 2018.[7] Mosaic then moved the trial court to permit an interlocutory appeal of the summary judgment ruling under section 51.014(d) of the Civil Practice and Remedies Code so that the court of appeals could determine the viability of Simien's cause of action.

The trial court granted the motion in an order signed on October 24, 2018.[8] That order states that the trial court's "September 10, 2018 Order granting the Plaintiff's Motion for Partial Summary Judgment, which was filed on June 27, 2018, is hereby vacated and replaced with this Order, which is an amendment of that prior order." The following paragraph then states that Simien's June 27, 2018 motion for partial summary judgment "is hereby granted."

After making the required findings, the order permits Mosaic to file an application for interlocutory appeal under section 51.014(f) of the Civil Practice and Remedies Code, defining the controlling question of law as follows:

> [W]hether it was a violation of Section 13.5031(3) of the Texas Water Code and Rule 24.123(e), Rule 24.124(a),(b),(c), and (e), and Rule 24.125(a),(f), and (k) of the PUC Rules (16 TEX. ADMIN. CODE § 24.121 *et seq*.), thereby establishing liability under Section 13.505 of the Texas Water Code, to charge the Plaintiff, Paul Simien, on a per-unit basis, certain charges from the retail public

---

[7] As discussed below, the trial court subsequently vacated and replaced its September 10, 2018 order multiple times.

[8] The trial court subsequently signed two orders on November 20, 2018, each of which states that it "amends and replaces" the October 24 order granting permission to appeal. The two orders are substantially identical except with respect to whether the order's identification of the controlling question of law references all of the PUC rules listed in the corresponding portion of the initial October 24 order or only Rule 24.124(a).

11

utility (Harris County Municipal Utility District No. 55), including a monthly fire protection service charge, a monthly emergency medical service charge, and a law enforcement service charge, which were combined together, along with a monthly service charge on which the Plaintiff does not assert a claim, and described as a "Water/Sewer Base Fee" in the monthly bills to the Plaintiff.

Mosaic filed a notice of appeal as well as an application for permission to appeal, which the court of appeals denied. 644 S.W.3d 671 (Tex. App.—Houston [1st Dist.] 2019) (per curiam). In a one-paragraph opinion, the court concluded that Mosaic's petition "failed to establish each requirement of Texas Rule of Appellate Procedure 28.3(3)(e)(4) [sic]." *Id.*[9]

### E. Class certification proceedings

While Mosaic pursued its interlocutory appeal of the partial summary judgment, Simien pursued class certification in the trial court. On September 21, 2018, Simien filed his opposed motion for class certification and attached a proposed trial plan.

The motion states that Simien "presents a single statutory claim pursuant to the Texas Water Code . . . and [PUC] Rules . . . for excessive and unlawful water and wastewater fees charged to residential apartment tenants" at Baybrook Village. Simien sought to certify one class composed of current and former tenants at Baybrook Village who

---

[9] This "tellingly . . . identical typographical error" appears in many of the First Court of Appeals' boilerplate memorandum opinions denying petitions for permission to appeal. *See Indus. Specialists, LLC v. Blanchard Refin. Co.*, 652 S.W.3d 11, 18 (Tex. 2022) (plurality op.); *id.* at 36 n.20 (Busby, J., dissenting).

were charged and paid a "Water/Sewer Base Fee" in excess of $20 during the Class Period, which the motion defined as June 1, 2015, through September 30, 2017. Simien argued that he paid $163 in unlawful fees for fire, EMS, and law enforcement services. Based on Mosaic's discovery responses, he estimated that over 750 other tenants were likewise charged a collective total of $358,000 in hidden fees during the proposed 28-month class period.

Mosaic filed a response in opposition. With one exception,[10] Mosaic's response did not challenge whether Simien had established any prerequisite to class certification. Instead, relying on the arguments from the parties' earlier briefing regarding Mosaic's special exceptions and Simien's entitlement to partial summary judgment, Mosaic argued that the trial court had not conducted (and could not conduct) the required "rigorous analysis" of the prerequisites for class certification because any ruling would be based on a "significant misunderstanding of the law" under *Exxon Mobil Corp. v. Gill*, 299 S.W.3d 124, 129 (Tex. 2009) (per curiam).

Following a hearing, the trial court granted Simien's motion for class certification on October 24, 2018—one minute after signing the initial order granting Mosaic's request for permission to appeal the prior order granting summary judgment. The class certification order defined the class (with certain exclusions) as "[a]ll Texas residents who, during the Class Period [of June 1, 2015, to September 30, 2017], (i) are or were tenants at Baybrook Village . . . and (ii) were charged and paid a

---

[10] Mosaic challenged Simien's adequacy as a class representative, but it has not raised that challenge in this Court.

'Water/Sewer Base Fee' in excess of $20." The trial court found that the following constitute issues of law or fact common to the members of the class: (1) "[w]hether Defendants charged their tenants a 'Water/Sewer Base Fee' that includes non-water and non-wastewater charges for Fire, EMS, and Law Enforcement"; (2) "[w]hether the inclusion of the Fire, EMS, and Law Enforcement charges in the 'Water/Sewer Base Fee' violated the Texas Water Code and PUC Rules"; (3) "[w]hether the Fire, EMS, and Law Enforcement charges constitute an 'overcharge' pursuant to Section 13.505"; and (4) "[i]f the answer to [number three] is 'yes,' whether each member of the Class is entitled to statutory damages as provided by Section 13.505."

The order states that the trial court had reviewed Simien's proposed trial plan, which the trial court "believes explains in adequate detail how this matter can proceed on a manageable, classwide basis." The order also includes the trial court's findings "that the only issues of fact regarding individual class members are the amount of the charges and the amount of the payments, and that such information is readily available and accessible from Defendants' electronic databases, and can be extracted in summary reports with little effort." Thus, "very little time will be expended on any individual issues relating [to] the quantum of the charges assessed and paid." Although the trial court "reserve[d] the right to enter additional orders relating to the Class certification," Mosaic raised no objections in the trial court regarding the content of the class certification order or the referenced trial plan's compliance with any requirement of Rule 42(c)(1)(D) and did not ask the trial court

14

to make any alterations or amendments to the order under Rule 42(c)(1)(C).

Mosaic filed an interlocutory appeal of the class certification order.  *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(3).  In addition to reiterating its challenge to the rigor of the trial court's analysis under *Gill*, Mosaic argued that the trial court's failure to identify or discuss the defenses asserted in Mosaic's original answer provided independent grounds for reversal of the class certification order.

The court of appeals affirmed.  646 S.W.3d 847 (Tex. App.—Houston [1st Dist.] 2020).  Declining to reach the merits of the trial court's rulings on summary judgment, the court rejected Mosaic's argument that reversal of the class certification order was required under *Gill*.  *Id*. at 854-55.  The court also rejected Mosaic's challenge to the trial court's compliance with Rule 42(c)(1)(D), concluding that the trial court's rulings on Mosaic's special exceptions and Simien's motion for summary judgment adequately addressed Mosaic's defenses.  *Id*. at 855.

### STATUTORY AND REGULATORY BACKGROUND

### A.     The PUC's statutory authority to regulate water bills

Chapter 13 of the Water Code provides that the PUC "may regulate and supervise the business of each water and sewer utility within its jurisdiction, including ratemaking and other economic regulation." TEX. WATER CODE § 13.041(a).[11]  The PUC is authorized to

---

[11] *See also* TEX. WATER CODE § 13.002(23) (defining "[w]ater and sewer utility," "public utility," or "utility" for purposes of Chapter 13 to exclude "any

"do all things, whether specifically designated in [Chapter 13] or implied in th[at] chapter, necessary and convenient to the exercise of these powers and jurisdiction." *Id.*

Subchapter M of Chapter 13 regulates how apartment landlords may bill their tenants for water and wastewater-related charges, whether submetered or allocated. *See id.* §§ 13.501-13.506. Submetered utility service commonly refers to "[w]ater utility service that is master metered for the owner by the retail public utility [here, the MUD] and individually metered by the owner at each dwelling unit," as well as "wastewater utility service based on submetered water utility service." 16 TEX. ADMIN. CODE § 24.121(c)(12).[12] "Nonsubmetered master metered utility service"—also referred to as allocated service or nonsubmetered service—includes "water utility service that is master metered for the apartment house but not submetered," as well as "wastewater utility service based on master metered utility service." TEX. WATER CODE § 13.501(4). The service in this case was nonsubmetered, but an understanding of both types of service is helpful in analyzing the issues before us.

---

person or corporation not otherwise a public utility that furnishes the services or commodity only to itself or its employees or tenants as an incident of that employee service or tenancy when that service or commodity is not resold to or used by others"); 16 TEX. ADMIN. CODE § 24.121(14) (defining "[u]tility service" to "include[] only drinking water and wastewater").

[12] *But see, e.g.*, 16 TEX. ADMIN. CODE § 24.121(c)(12) (defining submetered utility service to additionally include "water utility service measured by point-of-use submeters when all of the water used in a dwelling unit is measured and totaled" and "wastewater utility service based on total water use as measured by point-of-use submeters").

**Submetered service.** Section 13.503 provides that the PUC "shall encourage submetering of individual rental or dwelling units by master meter operators or building owners to enhance the conservation of water resources." *Id.* § 13.503(a). Section 13.503 requires the PUC to "adopt rules and standards" under which landlords "may install submetering equipment for each individual rental or dwelling unit for the purpose of fairly allocating the cost of each individual rental or dwelling unit's water consumption." *Id.* § 13.503(b). The PUC's submetering rules must, "[i]n addition to other appropriate safeguards for the tenant," require that a landlord "may not impose on the tenant any extra charges, over and above the cost per gallon and any other applicable taxes and surcharges that are charged by the retail public utility to the [landlord]," except as provided by section 13.503. *Id.*

**Nonsubmetered service.** Section 13.5031 separately provides that "[n]otwithstanding any other law," the PUC "shall adopt rules and standards governing billing systems or methods used by" landlords "for prorating or allocating among tenants nonsubmetered master metered utility service costs." *Id.* § 13.5031. "In addition to other appropriate safeguards for the tenant," *id.*, section 13.5031 specifically directs the PUC to adopt rules requiring that "except as provided by this section, [a landlord] may not impose additional charges on a tenant in excess of the actual charges imposed on the owner or condominium manager for utility consumption by the . . . apartment house." *Id.* § 13.5031(3). The section also specifically requires the PUC to adopt rules requiring the inclusion of "a clear written description of the method of calculation of the allocation of nonsubmetered master metered utilities" in tenants'

17

leases, *id.* § 13.5031(1), as well as requiring landlords to "maintain adequate records regarding the utility consumption of the . . . apartment house, . . . the charges assessed by the retail public utility, and the allocation of the utility costs to the tenants," *id.* § 13.5031(4).

**Private enforcement.** At the time Simien filed this suit, Subchapter M also provided a private enforcement mechanism for certain billing practices as follows:

> In addition to the enforcement provisions contained in Subchapter K, if [a landlord] violates a rule of the utility commission regarding submetering of utility service . . . or nonsubmetered master metered utility costs, the tenant may recover three times the amount of any overcharge, a civil penalty equal to one month's rent, reasonable attorney's fees, and court costs from the [landlord]. However, [a landlord] is not liable for a civil penalty if the [landlord] proves the violation was a good faith, unintentional mistake.

*Id.* § 13.505.

### B.    PUC billing rules

Exercising its statutory grant of authority, the PUC promulgated several rules that are collected in Title 16, Chapter 24, Subchapter H of the Texas Administrative Code. Subchapter H "appl[ies] to apartment houses . . . billing for water and wastewater utility service on a submetered or allocated basis." 16 TEX. ADMIN. CODE § 24.121(b).[13] The following rules are relevant here.

---

[13] Under Rule 24.123, "[a] rental agreement provision that purports to waive a tenant's rights or an owner's responsibilities under this subchapter is void." 16 TEX. ADMIN. CODE § 24.123(e).

**Rule 24.124 (now 24.281).**[14]  This rule, entitled "Charges and Calculations," regulates whether and to what extent landlords may pass along to their tenants various amounts they paid the utility for water and wastewater service.  Rule 24.124(a) addresses which amounts from the utility's water bills can be included:

> **Prohibited charges.** Charges billed to tenants for submetered or allocated utility service may only include bills for water or wastewater from the retail public utility and must not include any fees billed to the owner by the retail public utility for any deposit, disconnect, reconnect, late payment, or other similar fees.

*Id.* § 24.124(a).

Other parts of the rule provide various methods for calculating how much of these eligible amounts should be billed to each individual tenant.  Subsections (b) and (c) specify the amount to bill each tenant for the utility's customer service charges and dwelling unit base charges, which are not volume-based.  *Id.* § 24.124(b)-(c).  And subsection (e) provides an exclusive list of five formulas that may be applied to determine the amount to bill each tenant for the volume-based component of the utility's charges.  *Id.* § 24.124(e)(1), (e)(1)(A), (e)(2).  For landlords who have been using a different formula, subsection (f) sets forth three options: "(1) adopt one of the methods in subsection (e) of [the rule]; (2) install submeters and begin billing on a submetered basis; or (3) discontinue billing for utility service."  *Id.* § 24.124(f).

---

[14] As noted above, the applicable PUC rules were renumbered and recodified using substantially identical language after Simien filed this suit.  *See supra* at 3 n.3.  We cite the original rule numbers, but we also provide in this section the current numbers of the most relevant rules.

**Rule 24.125 (now 24.283).** The next rule, entitled "Billing," contains various regulations regarding the preparation, form, and content of the landlord's bills to tenants. For example, subsection (f) lists information that must be included on the landlord's monthly bill. Among other requirements, landlords' bills must include: (1) the "total amount due for submetered or allocated water"; (2) the "total amount due for submetered or allocated wastewater"; (3) the "total amount due for dwelling unit base charge(s) or customer service charge(s) or both, if applicable"; and (4) the "total amount due for water or wastewater usage, if applicable." *Id.* § 24.125(f). Subsection (e) adds that "charges for submetered or allocated utility service must be separate and distinct from any other charges on the bill." *Id.* § 24.125(e).

### C. The 2017 amendments

In 2017, the Legislature materially amended section 13.505 of the Water Code in the following ways. First, the amendments provide that the PUC "has exclusive jurisdiction for violations under this subchapter." TEX. WATER CODE § 13.505(b). Second, the Legislature defined "overcharge" to mean "the amount, if any, a tenant is charged for submetered or nonsubmetered master metered utility service to the tenant's dwelling unit after a violation occurred relating to the assessment of a portion of utility costs in excess of the amount the tenant would have been charged under this subchapter." *Id.* § 13.505(a). Third, the Legislature omitted certain forms of recovery from the private-enforcement mechanism provision, which now provides:

> If [a landlord] . . . violates a rule of the utility commission regarding utility costs, the person claiming the violation may file a complaint with the utility commission.

20

. . . If the utility commission determines that the [landlord] overcharged a complaining tenant for water or wastewater service from the retail public utility, the utility commission shall require the [landlord] to repay the complaining tenant the amount overcharged.

*Id.* § 13.505(c).

## ANALYSIS

### I. Jurisdiction: The legislative repeal of certain remedies did not affect the trial court's subject-matter jurisdiction, and Simien has standing.

We granted Mosaic's petitions for review of the trial court's orders granting partial summary judgment (*Simien 1*) and class certification (*Simien 2*). We begin by considering Mosaic's jurisdictional challenges. In both *Simien 1* and *Simien 2*, Mosaic contends the trial court lacked subject-matter jurisdiction over Simien's requests for certain statutorily created remedies, which Mosaic argues were retroactively repealed when the Legislature amended section 13.505 in 2017. In *Simien 2*, Mosaic also contends the Court should dismiss Simien's claims because he lacks the injury constitutionally required for standing. We address these challenges in turn.[15]

### A. Mosaic's remedy-specific challenges do not implicate jurisdiction.

Asserting that "whether a court has jurisdiction over a particular remedy versus a statutory claim as a whole are separate inquiries,"

---

[15] Although the Legislature amended section 13.505 in 2017 to provide the PUC with "exclusive jurisdiction for violations under this subchapter," TEX. WATER CODE § 13.505, neither party has urged on appeal that the PUC has exclusive jurisdiction over Simien's suit, which was already pending when the amendment became effective.

Mosaic contends the trial court should have dismissed Simien's requests for certain elements of damages and other forms of relief—the trebling of overcharges, the one-month rent penalty, and attorney's fees—for lack of subject-matter jurisdiction because the Legislature amended section 13.505 to eliminate that relief while the case was pending. We reject this jurisdictional challenge for three reasons.

First, we disagree with Mosaic's suggestion that trial courts partially lose jurisdiction whenever an element of damages is not available in a particular case for some legal reason. Of course, we have repeatedly recognized that "each party must establish that he has standing to bring each of the claims he himself alleges—meaning that the court must assess standing plaintiff by plaintiff, *claim by claim*." *Heckman v. Williamson County*, 369 S.W.3d 137, 153 (Tex. 2012) (emphasis added). And we have treated "injunctive relief [and] damages" as separate "claim[s]" for this purpose. *Id.* at 155; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). But we have never suggested that the standing analysis extends to particular elements of damages or other monetary relief when other elements are legally available.

To the contrary, the U.S. Supreme Court has long described redressability as an "*'irreducible'* component of standing" and has recognized that "the ability to effectuate a partial remedy satisfies th[at] redressability requirement." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (emphasis added) (quoting *Spokeo, Inc. v. Robins*, 578 U.S.

330, 338 (2016)).[16] We also agree with Simien that accepting Mosaic's novel rule would be inconsistent with our recognition in *Dubai Petroleum Co. v. Kazi* that "the modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." 12 S.W.3d 71, 77 (Tex. 2000) (quotation marks omitted).

Second, the Legislature did not completely repeal the underlying statutory requirements or the remedies available for violating them, as it did in *Dickson v. Navarro County Levee Improvement District No. 3*, 139 S.W.2d 257, 259 (Tex. 1940). *Cf. Quick v. City of Austin*, 7 S.W.3d 109, 128 (Tex. 1998) ("When a right or remedy is dependent on a statute, the *unqualified* repeal of that statute . . . deprives a court of subject matter jurisdiction over the *cause*.") (emphases added). Here, even if the amendments were retroactive, the current statute still requires a landlord "to repay the complaining tenant the amount overcharged." TEX. WATER CODE § 13.505(c). Thus, at least one statutory remedy of damages is still available to tenants.

Third, the retroactive effect of the 2017 amendments falls outside the scope of Mosaic's appeals. The issue was not listed in any of the trial court's orders permitting interlocutory appeal, and Mosaic specifically

---

[16] *Accord Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020) ("[A] plaintiff does not lack standing in its proper, jurisdictional sense simply because he cannot prevail on the merits of his claim; he lacks standing [when] his claim of injury is too slight for a court to afford redress." (quotation marks omitted)); *Heckman*, 369 S.W.3d at 154 (holding that a putative class representative "need not have standing on each and every one of the class's claims in order to satisfy the standing requirement" and that "[s]o long as an individual plaintiff has standing on *some* claim, he has standing to pursue class certification as to that claim").

disclaimed the issue when it sought permission to appeal from the trial court. We therefore express no view on the retroactivity issue, which remains open for further litigation.

### B. Simien has standing.

Characterizing Simien's claim as a procedural complaint about form rather than substance, Mosaic next contends that Simien lacks standing to sue under section 13.505 because mislabeling an otherwise-valid non-water charge amounts to a "bare procedural violation," which is insufficient to establish the constitutionally required injury. *Spokeo*, 578 U.S. at 342. But Simien alleges he parted with money that he would not have owed or paid had Mosaic complied with PUC rules—a loss that is one of the "most obvious" of "traditional tangible harms." *TransUnion*, 141 S. Ct. at 2204. We therefore hold that Simien has pleaded a cognizable injury.

"A court has no jurisdiction over a claim made by a plaintiff without standing to assert it." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008). Standing is a component of subject-matter jurisdiction that cannot be waived and thus may be raised at any time, including on appeal. *West Orange-Cove Consol. I.S.D. v. Alanis*, 107 S.W.3d 558, 583 (Tex. 2003). "The standing requirement derives from the Texas Constitution's provision for separation of powers among the branches of government, which denies the judiciary authority to decide issues in the abstract, and from the open courts provision, which provides court access only to a 'person for an injury done him.'" *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018) (quoting TEX. CONST. art. 1, § 13).

24

"The standing analysis begins with determining the nature of the wrong being alleged and whether there was a causal connection between a defendant's conduct and the injury caused by the alleged wrong." *Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 279 (Tex. 2016). "[T]o establish standing, a plaintiff must plead facts demonstrating that the plaintiff suffered an injury, this injury is fairly traceable to the defendant's conduct, and this injury is likely to be redressed by the requested relief." *Meyers*, 548 S.W.3d at 486. The "alleged injury must be concrete and particularized, actual or imminent, not hypothetical." *DaimlerChrysler Corp.*, 252 S.W.3d at 304-05 (footnotes omitted).

Mosaic contends that the mere mislabeling of an otherwise valid non-water charge amounts to a "bare procedural violation" under *Spokeo* and *TransUnion*. Unlike in those cases, however, Simien has alleged that he suffered direct economic harm from Mosaic's labeling because it induced him to pay Mosaic more money than Mosaic was legally entitled to collect. "[T]hat sort of pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *see also Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 696 (Tex. 2020) ("Data Foundry thus alleges an injury that is particularized to it—Data Foundry suffers financial harm because it must pay Austin Energy a particular sum of money that exceeds what Data Foundry contends it should have to pay."); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Warth v. Seldin*, 422 U.S. 490, 525 (1975) (recognizing that "out-of-pocket losses . . . are obviously more

25

palpable and concrete than those held sufficient to sustain standing in other cases").

Simien's allegations allow for a reasonable inference that the alleged pocketbook injury was fairly traceable in part to the format of Mosaic's billing, which therefore was not "divorced from any concrete harm." *TransUnion*, 141 S. Ct. at 2213. As discussed in detail in Part II, the parties dispute not only whether the disputed emergency fees can properly be charged under the lease but also, even if so, whether they were properly included in charges billed for utility service. Which party is correct goes to the merits, not to subject-matter jurisdiction. *See Pike*, 610 S.W.3d at 774.

In sum, Simien has alleged not just the "[d]eprivation of a procedural right," but also the existence of a "concrete interest that is affected by the deprivation." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right . . . ."). We therefore hold that Simien has sufficiently alleged an injury in fact.

## II. Summary judgment: Simien established a violation of section 13.505 of the Water Code.

As explained above, the trial court certified for permissive interlocutory appeal the question at the heart of its order granting partial summary judgment: whether Mosaic violated Chapter 13 or related PUC rules that trigger liability under section 13.505. In deciding this question by partial summary judgment early in the case, the court commendably followed our instruction that "dispositive issues should be resolved by the trial court before [class] certification is

26

considered." *State Farm Mut. Auto Ins. Co. v. Lopez*, 156 S.W.3d 550, 557 (Tex. 2004). Although the court of appeals opted not to "accept" the appeal of the partial summary judgment, TEX. CIV. PRAC. & REM. CODE § 51.014(f),[17] we agree with the trial court that *Simien 1* meets the requirements for a permissive appeal, *see id.* § 51.014(d), and we have jurisdiction to review that court's order granting partial summary judgment under our decision in *Sabre Travel International, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725, 733 (Tex. 2019).[18]

Turning to the merits of *Simien 1*, we conclude that Simien conclusively established a violation of relevant PUC rules and a resulting overcharge under section 13.505. We therefore affirm the trial court's grant of partial summary judgment in Simien's favor.

### A. Standard of review

"We review summary judgments de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022) (quotation marks omitted). "When the trial court does not specify the grounds for its ruling, a summary judgment must be affirmed if any of the grounds on

---

[17] *See* 644 S.W.3d at 671-72.

[18] *See Sabre Travel*, 567 S.W.3d at 733 ("If the trial court concludes that the threshold requirements are satisfied and certifies the interlocutory order according to section 51.014(d), it 'permits an appeal' from the order, and this Court's jurisdiction is then proper . . . regardless of how the court of appeals exercises its discretion over the permissive appeal."). *Accord Dougherty v. N. Tr. Co.*, 647 S.W.3d 708, 709 (Tex. 2022) (per curiam) ("Notwithstanding the court of appeals' refusal to accept the appeal, this Court has jurisdiction to review the trial court's interlocutory order on the merits."); *Valero Refinery-Tex., LP v. Vela*, 647 S.W.3d 709, 710 (Tex. 2022) (per curiam) (same).

which judgment is sought are meritorious." *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

"A party moving for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to judgment as a matter of law." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). "[T]he burden then shifts to the non-movant to disprove or raise an issue of fact as to at least one of those elements." *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014).

"The non-movant has no burden to respond to or present evidence regarding the motion until the movant has carried its burden to conclusively establish the cause of action or defense on which its motion is based." *State v. Ninety Thousand Two Hundred Thirty-Five Dollars & No Cents in U.S. Currency ($90,235)*, 390 S.W.3d 289, 292 (Tex. 2013).[19] "On appeal, the movant still bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).

---

[19] *See also Amedisys,* 437 S.W.3d at 511-12 ("[I]f the movant does not satisfy its initial burden, the burden does not shift" and "the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right to judgment."); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam) ("The nonmovant has no burden to respond to a summary judgment motion unless the movant conclusively establishes its cause of action or defense.").

### B. Section 13.505 and related PUC rules apply to bills for water utility service costs that include compensation for non-water charges.

Mosaic complains that the trial court misconstrued the extent to which section 13.505 governs Mosaic's ability to bill tenants for the disputed MUD fees for two reasons. First, Mosaic argues that Chapter 13 and associated PUC rules regulate only how landlords pass on to their tenants "charges related to . . . drinking water and wastewater service" imposed by a retail public utility; they do not regulate the billing of "fees that are **not** for or related to" such service. Thus, Mosaic contends that its decision to increase the "Water/Sewer Base Fee" it charged tenants by an amount equal to the non-water fees for fire, EMS, and law enforcement services it paid the MUD cannot result in liability under section 13.505, regardless of whether Mosaic had authority to charge tenants for those non-water services.

In other words, Mosaic argues that the statutes and rules addressing landlord billing draw a distinction between utility charges that are related to water service costs (regulated) and utility charges that are unrelated to water service costs, such as emergency service fees (unregulated). Unlike the dissent (which we address in Part II.D.), all parties take the position that both per-gallon usage charges and fixed base charges related to the cost of water service fall on the regulated side of this line; Mosaic's primary argument is that charges for fire, EMS, and law enforcement fall on the unregulated side even if bundled

with fixed water service charges into a "Water/Sewer Base Fee."[20]  As discussed below, we conclude that Mosaic's argument is based on an incorrect reading of the statute and rules.

Second, Mosaic points out that it did not bill Simien separately for the MUD fees for fire, EMS, and law enforcement services, as it believes it was authorized to do under the lease, and that such a bill would have offset any potential overcharge liability it incurred by including an amount equal to those fees in the Water/Sewer Base Fee. In Mosaic's view, even if bundling non-water MUD fees with water-related fees violated a PUC rule, that violation did not result in an "overcharge" recoverable under section 13.505 because Simien would have owed the additional sums under his lease in any event.  We conclude in Part II.C. that this argument fails because the lease does not authorize Mosaic to charge Simien the disputed non-water fees.

Statutory and regulatory construction present questions of law for the court, which we review de novo.  *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557 (Tex. 2022). "When construing a statute, our primary objective is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen." *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007). "We use definitions prescribed by the Legislature and any technical or particular

---

[20] Specifically, Mosaic recognizes that Rule 24.124(a) regulates fees "that relate to allocated utility service but that are not actual usage charges for water or wastewater," observing that such fees are "within the Rule's regulatory scope."  In Mosaic's view, however, "nothing in that rule was intended to expand the scope of the PUC Rules' regulatory reach to fees completely unrelated to water or wastewater service."

meaning the words have acquired." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). Otherwise, "[w]ords not statutorily defined bear the common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). "Further, courts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction standing alone." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). "In ascertaining a term's meaning, courts look primarily to how that term is used throughout the statute as a whole." *Id.*

Turning to Mosaic's first argument, section 13.505 provided at the time Simien filed this suit that "the tenant may recover" if the landlord "violates a rule of the utility commission regarding . . . nonsubmetered master metered utility costs." TEX. WATER CODE § 13.505. Mosaic contends that this section creates liability only for a landlord's "potential errors in calculation" when following a prescribed formula for allocating utility service charges, and it does not reach "rule violations that do not involve miscalculations regarding the correct usage-related charge."

But none of those words appear in the statute. The ordinary meaning of "regarding" is expansive and synonymous with terms like "respecting," "concerning," or "referring to."[21] Rule 24.124(a) provides

---

[21] *See* WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1622 (1996) (defining "regarding" to mean "with regard to; respecting; concerning"); WEBSTER'S NEW COLLEGIATE DICTIONARY 965 (1980) (defining "regarding" to mean "with respect to: CONCERNING"); THE AMERICAN HERITAGE

31

that "charges billed to tenants for . . . allocated utility service may only include bills for water or wastewater from the retail public utility." This rule concerns or refers to nonsubmetered utility costs because it determines how such costs may—and may not—be billed to tenants. The rule also carries out the Legislature's directive to "adopt rules and standards . . . for prorating or allocating among tenants nonsubmetered master metered utility service costs." TEX. WATER CODE § 13.5031. Because Rule 24.124 is a rule "regarding . . . nonsubmetered master metered utility costs," *id*. § 13.505, the statute provides a cause of action for violations of that rule.

We also reject Mosaic's related argument that section 13.505 and Rule 24.124(a) only regulate charges that are actually *for* or related to water utility service, and thus they do not apply when landlords increase the water utility service charges they bill to tenants by an amount equivalent to various undisclosed non-water fees. Under Mosaic's theory, even a landlord's blatant padding of a tenant's water bill—such as increasing the tenant's water usage charge or base fee to three times the amount that the public utility charged the landlord—would not violate the rule because the inflated portion of the charges are not truly

---

DICTIONARY OF THE ENGLISH LANGUAGE (5th ed.) (2011) (defining "regarding" to mean "[i]n reference to; with respect to; concerning").

for utility service; they are literally *for* nothing that the tenant received at all.[22] That makes no sense.[23]

Mosaic's reading ignores the Legislature's choice to prohibit the "impos[ition]" of "additional charges on a tenant . . . for utility consumption" that are "in excess of the actual charges imposed on" the landlord. *Id.* § 13.5031(3). The PUC implemented this statute through Rule 24.124, which similarly prohibits including non-water fees in the "[c]harges billed to tenants for . . . utility service."

We understand Rule 24.124(a) to provide that if **(1)** a dollar amount is "billed to tenants" as a "[c]harge[] . . . for submetered or allocated utility service,"[24] then **(2)** that charge **(a)** "may only include bills for water or wastewater from the public utility," and **(b)** "must not include any fees billed to the owner by the retail public utility for any deposit, disconnect, reconnect, late payment, or other similar fees." 16

---

[22] *But cf.* TEX. WATER CODE § 13.504 ("If, during the 90-day period preceding the installation of individual meters or submeters, a [landlord] . . . has increased rental rates and the increase is attributable to increased costs of utilities, the [landlord] . . . shall immediately reduce the rental rate by the amount of the increase and refund all of the increase that had previously been collected within the 90-day period.").

[23] The dissent appears to misunderstand Mosaic's theory. The dissent argues that the padded amount is not a charge "for water or wastewater from the retail public utility," so bundling it with a regulated charge would violate the rule. *Post* at 9-10 (Bland, J. dissenting). We agree with the dissent, but Mosaic does not. In Mosaic's view, the rule governs only to the extent the landlord is passing on to tenants a charge for water or wastewater from the retail public utility, so it does not apply to any other amounts that the landlord includes in the charge.

[24] 16 TEX. ADMIN. CODE § 24.124(a). Or, in the words of section 13.5031, if the amount is "impose[d] . . . on a tenant . . . for utility consumption." TEX. WATER CODE § 13.5031(3).

TEX. ADMIN. CODE § 24.124(a). The language of the "must not include" clause—labeled (2)(b) above—is a carve-out that prohibits landlords from billing for certain non-volume water utility service costs that would otherwise fall within the scope of the Rule's preceding text. Thus, Rule 24.124(a), like section 13.5031(3), prohibits any amount that a landlord bills a tenant for utility service from including non-water charges.

The record shows that the amounts Mosaic billed its tenants for the "Water/Sewer Base Fee" included not only (1) a customer service charge for water utility service that Mosaic allocated to each apartment using the formula provided by Rule 24.124(c),[25] but also (2) an amount equivalent to the non-water charges for fire, EMS, and law enforcement services that Mosaic paid the MUD for each apartment. Thus, Mosaic violated Rule 24.124(a).

This conclusion also is supported by and best harmonizes other PUC rules implementing Chapter 13 of the Water Code. *See supra* at 22-23. For example, Mosaic's interpretation of section 13.505 would create an end-run around Rule 24.125(e), which forbids the bundling of fees related to water and wastewater service with any fees unrelated to such service.[26] Mosaic's base fee likewise violates this rule. And it violates Rule 24.125(f), which requires the landlord's bill to state the

---

[25] "If the retail public utility's rate structure includes a customer service charge, the owner shall bill each dwelling unit the amount of the customer service charge divided by the total number of dwelling units, including vacant units, that can receive service through the master meter serving the tenants." 16 TEX. ADMIN. CODE § 24.124(c).

[26] "[C]harges for submetered or allocated utility service must be separate and distinct from any other charges on the bill." *Id.* § 24.125(e).

total amount due for customer service charges.[27]   Here, Mosaic's bill does not mention customer service charges, which make up only part of the "Water/Sewer Base Fee," and the amount due for those charges cannot be determined from the bill.

Similarly, Rule 24.124(f) provides that landlords who do not wish to install submeters must either use one of the PUC-approved allocation formulas or stop billing tenants for utility services. Mosaic's interpretation would practically eviscerate that rule by allowing landlords to "use" an approved allocation formula to make an initial calculation and then make arbitrary adjustments wholly outside of that formula based on the amounts of non-water charges.

Moreover, under the version of section 13.505 currently in effect, "[t]he utility commission has exclusive jurisdiction for violations under the subchapter." TEX. WATER CODE § 13.505(b).  But if Mosaic's proposed interpretation is correct, then neither the PUC nor a trial court would be able to confirm its jurisdiction over claims like Simien's without first permitting discovery and conducting a mini-trial on whether a seemingly water-related charge on a tenant's bill was in fact attributable to costs unrelated to water service. *Cf. Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018) ("When an agency has exclusive jurisdiction, courts lack jurisdiction until the party has exhausted all administrative remedies before the agency."). Thus, under the current statutory scheme, tenants pursuing a

---

[27] "The bill must clearly state that the utility service is submetered or allocated, as applicable, and must include all of the following: . . . (3) total amount due for dwelling unit base charge(s) or customer service charge(s) or both, if applicable . . . ."  16 TEX. ADMIN. CODE § 24.125(f).

contractual remedy to recoup utility fees assessed in violation of their lease—as Mosaic has repeatedly argued Simien should have done—would not discover their failure to exhaust administrative remedies until they are midway through litigation, having wasted considerable judicial resources along the way. For these additional reasons, Mosaic's construction is untenable.

Finally, contrary to Mosaic's assertions, our construction need not result in DTPA-like liability for Simien's misbilling claims because the pre-2017 version of section 13.505 also provides landlords with a defense when "the violation was a good faith, unintentional mistake." TEX. WATER CODE § 13.505.

### C. Mosaic's lease-based challenges to the summary judgment also fail.

We next consider Mosaic's second argument that even if it violated PUC rules, it did not "overcharg[e]" Simien for water or wastewater service, so it has no obligation to repay any "amount overcharged." *Id.* One of the grounds for Simien's motion for partial summary judgment was that "[n]owhere in [his] lease or in applicable sections of the Texas Water Code and PUC Rules does it provide for [Mosaic] to pass along to tenants as water and wastewater charges any non-water charges for EMS fee, Law Enforcement Fee, and Fire." Mosaic challenges this ground in its briefing here, contending that the lease did authorize it to charge tenants for the non-water MUD fees, and therefore there can be no "overcharge" liability under section 13.505 for marking up tenant bills for water and wastewater charges in an amount equal to the non-water fees.

This narrower theory presents the following question: whether an overcharge occurs under section 13.505 when a landlord-imposed water utility service fee includes undisclosed amounts equivalent to non-water fees paid by the landlord, or whether an overcharge also requires proof that the landlord lacked contractual authority to impose the non-water fees even if properly disclosed. We need not resolve that question today because we conclude Simien conclusively established that his lease did not obligate him to pay any part of the fees for fire, EMS, or law enforcement that the MUD charged Mosaic.[28]

"In construing [an] agreement, we first determine whether it is possible to enforce the contract as written, without resort to parol evidence." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2004).[29] "If the language lends itself to a clear and definite legal meaning, the contract is not ambiguous and will be construed as a matter of law." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex.

---

[28] We agree with the dissent that Simien has not pleaded a contract claim for breach of the lease. *Post* at 17. Rather, Simien has pleaded a statutory claim under section 13.505 of the Water Code to recover the amount overcharged due to a violation of an applicable PUC rule. As we have explained, Mosaic disputes whether including the non-water charges counts as an "overcharge" under the statute because it maintains those charges were otherwise authorized by the lease. Thus, we examine whether the lease authorized the charges to resolve Mosaic's statutory argument, not to rule on an unpleaded claim for breach of the lease.

[29] *Cf. Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) ("[E]xtrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity."); *Italian Cowboy Partners v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333-34 (Tex. 2011) ("Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." (quotation marks omitted)).

2017). "If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

"We must give effect to the parties' intentions, as expressed in their agreement," and "[w]e will give a contract language its plain, grammatical meaning unless it would clearly defeat the parties' intentions." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019) (quotation marks omitted). "[A]ll the usual 'rules of construction' apply, like the familiar presumptions favoring consistent usage, disfavoring surplusage, and using the plain meaning of undefined terms." *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 236 (Tex. 2022). "[W]e examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (quotation marks omitted). Thus, "[a] contract is not necessarily ambiguous simply because some sections arguably conflict." *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.). For example, "[c]onsistent with our long-established precedent that no one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions, a specific contract provision controls over a general one." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (cleaned up).

"If the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, however, the contract is ambiguous, creating a fact issue on the parties' intent." *ConocoPhillips Co. v. Koopman*, 547 S.W.3d 858, 874 (Tex. 2018). "Whether a particular provision or the interaction among multiple provisions creates an ambiguity is a question of law." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010). With these principles in mind, we turn to the lease language at issue.

In arguing that Mosaic was entitled to charge the disputed MUD fees to Simien under his lease, Mosaic relies primarily on language in paragraph seven of the lease, which is titled "Utilities and Services." Paragraph seven provides that Mosaic will pay for any item if checked and lists several options, none of which are checked. Paragraph seven then states that Simien will "pay for all other utilities and services, related deposits, and any charges or fees on such utilities and services during [his] Lease term." Standing alone, such "catch-all" language would support Mosaic's interpretation of the lease.

But Simien's lease also included various addenda, including an addendum for allocating water and wastewater costs and a separate addendum for allocating government fees. The latter addendum (quoted in full on page 4, *supra*) addresses "direct costs that the apartment community incurs" for "services provided to residents and charges for various governmental fees." It provides that Mosaic "ha[s] chosen to allocate the services and governmental fees indicated below using a standardized formula to distribute these costs fairly." But no selections are indicated for any of the enumerated services or fees, including an

39

unchecked box labeled "Emergency services fee." Because Mosaic chose not to select the box for emergency services and omitted the write-in selections for the MUD-imposed fire, EMS, and law enforcement fees used in the sample lease, the addendum does not permit Mosaic to pass such fees on to Simien.

"Consistent with our long-established precedent that provisions should be considered together and harmonized, when possible, so that none will be rendered meaningless, 'a specific contract provision controls over a general one.'" *Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, No. 20-0980, __ S.W.3d __, 2023 WL 2543049, at *12 (Tex. Mar. 17, 2023) (quoting *Pathfinder Oil & Gas*, 574 S.W.3d at 888). We agree with Simien that the specific lease addendum for government fees controls over the general agreement to pay for all other utilities and services in paragraph five of the lease. This interpretation gives meaning to both provisions without rendering either one superfluous. *See id.* at *14 & n.92; *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 531 (Tex. 2015).

Mosaic contends that "the government fees allocation addendum intentionally does not include emergency services" because "the per-unit MUD service charges were not intended to be, and were not, allocated." As such, Mosaic contends it did not need to select or include those fees in the addendum. We are not persuaded by Mosaic's argument that "[b]ecause the fees are charged on a per-unit basis, they are necessarily not allocated."

The MUD billed Mosaic directly, and it sent Mosaic an aggregate bill for each metered building. That bill included not only building-wide

40

charges for water and sewer usage and a related service charge, but also the disputed building-wide fire, EMS, and law enforcement fees. Although the MUD used the number of units per building in calculating the amount of the building-wide fees it imposed on Mosaic, the MUD did not bill each tenant or tell Mosaic how it would be fair to distribute the charges and fees among its tenants.[30] Thus, if Mosaic wished to bill its tenants for those charges and fees, it was up to Mosaic and the tenants to agree (subject to applicable laws and regulations) on a formula to use in allocating them fairly.

As discussed, Mosaic and its tenants did agree to an addendum regarding when and how to allocate government fees. The disputed fees here fall within the description of "direct costs that the apartment community incurs" in the paragraph of the addendum titled "[r]eason for allocation." In addition, "[p]er dwelling unit"—the method actually used by Mosaic and RealPage to distribute the disputed fees among the building's tenants—is one of the available "allocation method[s]" listed in the paragraph of the addendum titled "[a]llocation procedures."[31] Yet

---

[30] Even if the manner in which the MUD calculated its aggregate building-wide fee amounts were somehow relevant to the question whether Mosaic engaged in "allocation" when it divided those fees among its tenants on a per-unit basis, the record confirms that Mosaic was not simply passing through a fee that the MUD imposed on each current unit occupant. In particular, the MUD bills to Mosaic also included additional "true-up" installment charges for fire fees that Mosaic had incurred but failed to pay in prior years, and Mosaic chose to allocate those fees to Simien (who was not a tenant in those years) and other current tenants. The current tenants thus paid Mosaic more than the per-unit fire fee specified in the MUD's rate order.

[31] Similarly, paragraph twelve of Simien's lease—which Mosaic's relied-upon provision incorporates by reference—provides that "[i]f a utility is

41

Mosaic did not select that method in the addendum. Nor did it "indicat[e] below" that it "ha[s] chosen to allocate the . . . governmental fees" in dispute by selecting the box for emergency services or writing in selections for those fees. Thus, the parties did not agree that Mosaic could bill its tenants for the disputed fees it incurred.

For these reasons, we conclude that Mosaic failed to raise an issue of fact regarding whether it had a right to charge Simien the disputed MUD fees under his lease. We affirm the trial court's partial summary judgment.

### D. The statute and rules do not support the dissent's proposed limits on the PUC's regulatory authority.

Our dissenting colleagues largely do not take issue with our reasons for rejecting either of Mosaic's arguments. Indeed, they agree that Rule 24.124 "prohibit[s] bundling of other charges with 'charges billed to tenants for submetered or allocated utility service.'" *Post* at 8 (Bland, J., dissenting).

Instead, the dissent begins by characterizing Mosaic's conduct as nothing more than applying "imprecise billing label[s]" to charges that "were not fabricated." *Id.* at 1. To the contrary, the non-water emergency service charges were not *owed* under the lease, as Simien

---

submetered or prorated by an allocation formula, we'll attach an addendum to this Lease in compliance with state-agency rules." Although Mosaic has argued that the disputed MUD fees did not need to be selected on the addendum for allocating government fees because they are per-unit fees, a per-unit fee is still a form of "prorat[ing] by allocation formula." As such, Simien's lease required per-unit fees to be set forth in *an* addendum to the lease just as it required an addendum setting forth Mosaic's chosen formula for calculating its allocation of water and sewer fees.

could have discovered if Mosaic had disclosed their true nature. By bundling those charges into the base fee Mosaic billed Simien for water and wastewater utility service, Mosaic overcharged him in violation of section 13.505 and Rule 24.124.

The dissent also expresses concern that "statutory liability" for violating the rule is too "sweeping." *Id.* at 1. But that concern should be—and has been—addressed to the Legislature that created the liability, which responded by amending the statute after this suit was filed to give the PUC exclusive jurisdiction over landlord billing violations and limit the available remedies.

The dissent then turns to the merits, advocating a new ground— one Mosaic does not brief in this Court—for holding that Simien failed to establish a violation. Specifically, the dissent contends that "the governing statute and its implementing rules" have a more "limited scope," which covers only metered per-gallon charges for actual water usage. *Id.* Thus, the relevant statute and rules do not apply to the fixed water service charge that Mosaic bundled with non-water charges for fire, EMS, and law enforcement services into the "Water/Sewer Base Fee." *Id.* at 9-10. In the dissent's view, Simien's statutory claim fails not because the statute and rules do not reach non-water charges bundled with regulated service charges (as Mosaic argues), but because the statute and rules do not actually regulate service charges and therefore do not prohibit bundling them with non-water charges.

The dissent takes this position without any briefing from the parties or from the agency charged with implementing this statute—the power of which it proposes to limit. As noted above, Mosaic's position is

43

that the statute and rules *do* apply to the water service charges. Given the parties' agreement on this matter, our usual practice is to assume for purposes of our decision that they are correct. *See, e.g., City of Houston v. Hous. Prof'l Fire Fighters' Assn.*, Nos. 21-0518, 21-0755, __ S.W.3d __, 2023 WL 2719477, at *5 (Tex. Mar. 31, 2023); *Pike*, 610 S.W.3d at 782 ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one." (quoting *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring))).

Even if Mosaic had taken the position advocated by the dissent, however, we conclude that position is not supported by the statute or rules. The Water Code requires the PUC to "adopt rules and standards governing billing systems or methods used by" landlords "for prorating or allocating among tenants nonsubmetered master metered utility service *costs*." TEX. WATER CODE § 13.5031 (emphasis added).[32] And the Code provides a cause of action for violating a PUC rule regarding "nonsubmetered master metered utility costs." *Id.* § 13.505. The dissent contends that the MUD's flat customer service charge—which Mosaic included in its "Water/Sewer Base Fee"—does not qualify as a "master-meter[ed]" charge because it is not "measured in gallons used." *Post* at 13. But the statute and rules do not regulate only billing of volume-

---

[32] And the PUC has done so, "establish[ing] a comprehensive regulatory system" of "practices involving submetered and allocated billing . . . for water and sewer utility service." 16 TEX. ADMIN. CODE § 24.121(a).

based charges calculated using a master meter. Rather, they regulate the billing of all *costs* of master metered utility *service*.

Of course, all water utility service involves the use of meters—whether only master meters or also submeters. Yet the statute and rules concerning the costs of such service go beyond prescribing how tenants are billed for the metered gallons they use; they also address how tenants are billed for related fees that are not volume-based and cover other costs of providing the service. In particular, the statute and rules recognize that a fixed charge not dependent on the amount of water used is a type of "rate" for water utility "service," and that "service" involves not only the amount furnished or supplied but also the lines and facilities used.[33] In addition, the record illustrates that the "costs" of providing master metered utility service go beyond per-gallon usage charges. The MUD's rate order describes its fixed customer service charge as being "for the sale of water, collection, and disposal of sewer." And the MUD's billing vendor testified that the service charge—which utilities also refer to as a "base rate"—"relates to the delivery of" water and sewer service "[be]cause it is for maintenance [of] waterlines and sewer lines." Maintenance of lines and other facilities is certainly a cost of providing any sort of utility service.

---

[33] *See* TEX. WATER CODE § 13.002(21) (defining "service" to include "any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties"); *id.* § 13.002(17) (defining "rate" as "every . . . charge . . . for any service . . . described in [the definition just quoted]," including operating facilities for distribution or sale of water or collection of wastewater); 16 TEX. ADMIN. CODE § 24.121(c)(3) ("[a] customer service charge is a rate that is not dependent on the amount of water used through the master meter").

45

Moreover, in exercising its authority to regulate how the costs of master metered utility service are billed to tenants, the PUC crafted the primary rule at issue so that it specifically addresses costs beyond per-gallon usage charges—including fixed customer service charges. Rule 24.124(e) recognizes that "the retail public utility's *master meter bill* for water and sewer service to the tenants" may include "dwelling unit base charges or *customer service charges*." 16 TEX. ADMIN. CODE § 24.124(e) (emphases added). And subsection (c) provides that "[i]f the retail public utility's rate structure includes a *customer service charge*, the [landlord] shall *bill each dwelling unit* the amount of the customer service charge divided by the total number of dwelling units, including vacant units, *that can receive service through the master meter* serving the tenants." *Id.* § 24.124(c) (emphases added).

Finally, subsection (a)—which Simien contends Mosaic violated by including non-water amounts in the service charge for water and wastewater—expressly covers fixed as well as volume-based "[c]harges billed to tenants for submetered or allocated utility service." The latter half of the subsection provides that such charges "must not include any [utility] fees [for] deposit, disconnect, reconnect, late payment, or other similar fees." *Id.* § 24.124(a). None of those fees are based on the number of gallons used, which confirms that the Rule's scope is not limited to charges that are "initially master-metered," as the dissent advocates. *Post* at 8.

A separate point emphasized in the dissent is that subsection (a) applies only to charges for "*allocated* utility service." The dissent observes that this phrase is defined as "[w]ater or wastewater utility

46

service that is master metered to [a landlord] by a retail public utility and allocated to tenants by the [landlord]." 16 TEX. ADMIN. CODE § 24.121(c)(1). And it contends that because the MUD calculated its customer service charge to Mosaic using the number of apartments served, Mosaic's billing of that charge to its tenants was not for "allocated" utility service. *Post* at 13.

But as we explained in Part II.C. in rejecting a similar argument Mosaic makes regarding the lease, the MUD sent Mosaic an aggregate bill stating the total customer service charge for each metered building. Although the MUD used the number of apartments in calculating the amount of the building-wide charge it imposed on Mosaic, the MUD did not bill each tenant or tell Mosaic how it should allocate the charge to each tenant. Rather, Rule 24.124(c)—which we just quoted—told Mosaic how to allocate that charge: divide it by the total number of dwelling units that can receive service through the master meter. Mosaic then billed Simien for the amount of the customer service charge so allocated. Because Mosaic also added non-water amounts to that allocated service charge, it violated Rule 24.124(a).

In sum, the Water Code authorizes the PUC to regulate billing for non-volume water service charges, and its rules expressly apply to the MUD's fixed customer service charge. Simien has established that Mosaic overcharged him in violation of section 13.505 of the Water Code and PUC Rule 24.124(a) by including non-water amounts in that service charge, and the trial court correctly granted partial summary judgment in his favor.

47

### III. Class certification: the trial court did not abuse its discretion in certifying a class under Rule 42.

In its second appeal (No. 21-0159, *Simien 2*), Mosaic argues the Court should reverse the court of appeals' judgment affirming the class certification order for two reasons.[34] Mosaic first challenges the rigor of the trial court's assessment of the underlying substantive law as part of its consideration of the prerequisites to certifying a class. Alternatively, Mosaic contends that the trial court's failure to list the elements of its pleaded affirmative defenses in the class certification order independently warrants reversal. We address each challenge in turn.

#### A. The trial court did not base its decision to certify a class on a significant misunderstanding of law.

Rather than challenge the trial court's finding that any particular prerequisite to class certification was met, Mosaic's sole argument in support of reversal under *Gill* hinges on the correctness of the trial court's partial summary judgment, which we have affirmed. We therefore reject Mosaic's argument that the trial court erroneously based its decision to certify a class on a significant misunderstanding of the law.

"Courts must perform a 'rigorous analysis' before ruling on class certification to determine whether all prerequisites to certification have been met." *Sw. Refin. Co. v. Bernal*, 22 S.W.3d 425, 435 (Tex. 2000); *see also Compaq Comput. Corp. v. Lapray*, 135 S.W.3d 657, 671 (Tex. 2004)

---

[34] "This Court has jurisdiction to review an interlocutory appeal of an order certifying or denying certification of a class action without regard to whether a conflict exists between courts of appeals." *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 696 (Tex. 2008) (citing TEX. CIV. PRAC. & REM. CODE § 51.014(a)(3); TEX. GOV'T CODE § 22.225(d)).

("All prerequisites means all prerequisites. This includes all four elements of rule 42(a) as well as one of several elements of rule 42(b)."). And "the substantive law . . . must be taken into consideration in determining whether the purported class can meet the certification prerequisites under [Rule] 42." *Gill*, 299 S.W.3d at 126 (quoting *Union Pac. Res. Grp. v. Hankins*, 111 S.W.3d 69, 72-73 (Tex. 2003)). Indeed, Rule 42 requires that the certification order specify "the elements of each claim or defense asserted in the pleadings." TEX. R. CIV. P. 42(c)(1)(D)(i). Thus, as we explain today in *American Campus Communities v. Berry*, a court's task in applying Rule 42 "is to correctly understand the law governing the nature and elements of the claim and to gauge the claim's suitability for class resolution on the basis of that understanding." __ S.W.3d __, slip op. at 15-16 (Tex. Apr. 21, 2023) (No. 21-0874).

A defendant asserting that "a class has been certified based on a significant misunderstanding of the law," *Gill*, 299 S.W.3d at 129, may obtain reversal in two ways. First, if the proposed class claim has "no basis in law," *Berry* holds that "the 'rigorous analysis' necessary to certify a class cannot meaningfully be performed, and reversal of the class certification is required." __ S.W.3d __, slip op. at 22.

Second, the defendant may show that a significant misunderstanding of the law "[a]ffect[s] . . . the requirements for class certification." *Gill*, 299 S.W.3d at 129 (quotation marks omitted). When a trial court's certification order reveals an incorrect understanding of a claim or defense that may have materially impacted its analysis of a certification requirement, it is not for a reviewing court to guess whether

49

the trial court would still have exercised its discretion to certify a class had its understanding been correct. Rather, if it appears that certification may still be appropriate under a correct understanding, the reviewing court should reverse the certification and remand for the trial court to receive additional evidence or argument from the parties if necessary, conduct a rigorous analysis, and exercise its discretion based on that understanding. *See Phillips Petroleum Co. v. Yarbrough*, 405 S.W.3d 70, 80 (Tex. 2013); *Gill*, 299 S.W.3d at 129; *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 778 (Tex. 2005).

In this case, although the parties' dispute about the definition of overcharge under section 13.505 may well be "an important substantive issue," Mosaic has not challenged the trial court's finding on any certification prerequisite by explaining how the dispute "could have a significant effect" on that prerequisite. *BMG Direct Mktg.*, 178 S.W.3d at 777. In *BMG*, for example, the defendant asserted that "application of the voluntary-payment rule causes individual issues to predominate and therefore precludes class certification." *Id.* at 778. But here, as in *Southwestern Bell Telephone Co. v. Marketing on Hold, Inc.*, it appears from the record that "[w]hether [the defendant] was authorized to charge [the disputed] fees on the services in question . . . [is] susceptible to class-wide proof." 308 S.W.3d 909, 921 (Tex. 2010).

Because Mosaic failed to raise any substantive challenges to certification other than its attack on the now-affirmed partial summary judgment, we reject Mosaic's argument that the trial court failed to conduct a rigorous analysis in certifying the class.

50

## B. The class certification order addressed Mosaic's live defense.

Mosaic also argues that the trial court ignored its mandatory obligation to address and list the elements of Mosaic's pleaded affirmative defenses, which Simien characterizes as a harmless technicality that Mosaic has waived. We conclude the matter was preserved and the court complied with its obligation.

"An order certifying a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 42(g)." TEX. R. CIV. P. 42(c)(1)(B). In addition to other requirements, Rule 42 provides that an order granting class certification "must state" (1) "the elements of each claim or defense asserted in the pleadings"; (2) "why the issues common to the members of the class do or do not predominate over individual issues"; and (3) "how the class claims and any issues affecting only individual members, raised by the claims or defenses asserted in the pleadings, will be tried in a manageable, time efficient manner." TEX. R. CIV. P. 42(c)(1)(D), (c)(1)(D)(i), (c)(1)(D)(vi), (c)(1)(D)(viii).

"[A] trial plan is required in every certification order to allow reviewing courts to assure that all requirements for certification under Rule 42 have been satisfied." *Lopez*, 156 S.W.3d at 556. "The formulation of a trial plan assures that a trial court has fulfilled its obligation to rigorously analyze all certification prerequisites, and 'understands the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Id.* (quoting *Bernal*, 22 S.W.3d at 435).

51

"Rule 42 does not require adoption of a trial plan as a mere formality; rather, . . . the rule requires a rigorous analysis and a specific explanation of how class claims are to proceed to trial." *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 689 (Tex. 2002). "A trial court's certification order must indicate how the claims will likely be tried so that conformance with Rule 42 can be meaningfully evaluated." *Bernal*, 22 S.W.3d at 435.

Here, the parties dispute whether Mosaic properly preserved a complaint about the trial court's compliance with Rule 42(c)(1)(D), as well as whether such complaints are subject to harmless-error review even when preserved. We agree with Mosaic that it was not required to make any additional post-certification objections in the trial court to preserve for appellate review an error in omitting one of its defenses. Mosaic raised the defenses in a timely answer and opposed class certification, which made the trial court aware of the need to address those defenses if it certified a class. *See* TEX. R. APP. P. 33.1(a).

In addition, a court's failure to address live defenses is an abuse of discretion that is harmful by its nature. Even in cases where class certification may well be appropriate following a rigorous analysis of the certification prerequisites, "[a]ctual conformance with Rule 42 is indispensable, and compliance with the rule must be demonstrated, not presumed." *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 205 (Tex. 2007); *see also Yarbrough*, 405 S.W.3d at 80. We therefore turn to the merits of Mosaic's challenge to the trial court's compliance with Rule 42(c)(1)(D).

Mosaic correctly points out that the affirmative defenses it pleaded were not included in the class certification order or in the trial plan it referenced. With the exception of Mosaic's limitations defense, however, all of Mosaic's pleaded defenses were disposed of by the trial court's rulings on special exceptions and summary judgment prior to class certification. Thus, there was no reason to address those defenses in the order. The merits of the court's interlocutory rulings on the defenses are not before us.

As to Mosaic's limitations defense, Rule 42(c)(1)(D) requires a trial court to either dispose of a defense on the merits before certifying a class or address the defense in its certification order and explain how it will be tried. We conclude the trial court properly did the latter as part of its class definition. A limitations defense requires proof of "(1) when the cause of action accrued, and (2) that the plaintiff brought its suit later than the applicable number of years thereafter." *Draughon v. Johnson*, 631 S.W.3d 81, 89 (Tex. 2021). Simien's suit was filed on February 6, 2017, and the class includes only tenants who lived at Baybrook Village from June 1, 2015, through September 30, 2017, and were charged (and paid) the disputed fees during that time period. Although the parties disputed which statute of limitations was applicable, none disputed that the limitations period was at least two years. Mosaic does not challenge the class definition, nor does it argue that the class includes any claims barred by limitations.

By date-restricting the certified class to include only members with claims that are timely under Mosaic's understanding of the statute of limitations, the trial court fully addressed Mosaic's defense and left

53

no issues to be tried. In this situation, the court's failure to recite the elements of the limitations defense does not preclude "a meaningful determination of the certification issues," *Lopez*, 156 S.W.3d at 556, that the Rule 42(c)(1)(D) requirements were designed to help inform. Just as we have refused to read Rule 42 to "require a 'trial plan' by that name, set out in a separate document," *Henry Schein*, 102 S.W.3d at 659, we do not read Rule 42 to require that the class certification order separately enumerate the elements of a limitations defense so long as those elements are accounted for on the face of the order. Because all claims in the class defined by the trial court were brought less than two years after they accrued upon payment of the disputed fees, we conclude the trial court addressed Mosaic's only live defense as required by Rule 42(c)(1)(D) and did not abuse its discretion in certifying the class.

## CONCLUSION

We affirm the trial court's grant of partial summary judgment in Simien's favor, as well as the court of appeals' judgment affirming the trial court's order certifying a class under Rule 42.

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** April 21, 2023

54